1

2

3

4 **UNITED STATES DISTRICT COURT**

5 **NORTHERN DISTRICT OF CALIFORNIA**

6 **SAN JOSE DIVISION**

7

| | |
|---|---|
| 8  DEVIN REGAL, et al., | Case No.  5:22-cv-04321-BLF |
| 9           Plaintiffs, | |
| 10      v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| 11  COUNTY OF SANTA CLARA, et al., | |
| 12           Defendants. | [Re:  Dkt. No. 102] |

13

14          This case arises out of the tragic death by suicide of Frederick Regal ("Regal"), who

15 hanged himself in his jail cell while being held in custody at a County of Santa Clara ("County")

16 jail.  Plaintiffs are Regal's children, who bring constitutional claims for deliberate indifference

17 against the County as well as County therapist Consuelo Garcia, who assessed Regal while he was

18 in custody.

19          Before the Court is Defendants County of Santa Clara and Consuelo Garcia's Motion for

20 Summary Judgment.  Dkt. No. 102 ("Mot.").  Plaintiffs filed a brief in opposition to the motion,

21 Dkt. No. 115 ("Opp."), and Defendants filed a reply in support of their motion, Dkt. No. 120

22 ("Reply").  The Court held a hearing on the motion of February 20, 2025.  Dkt. No. 125.

23          For the following reasons, the Court GRANTS IN PART AND DENIES IN PART

24 Defendants' motion.

25 **I.    BACKGROUND**

26      **A.  The County's Suicide Prevention Measures for Custody Facilities**

27          The Main Jail facility in downtown San Jose ("Main Jail") and the Elmwood Correctional

28 Complex ("Elmwood") in Milpitas are jail facilities operated by the Santa Clara County Sheriff's

United States District Court
Northern District of California

1    Office.  Dkt. No. 104 ("Duran Decl.") ¶ 4.  Because suicide is the leading cause of deaths in local

2    jails throughout the country, Dkt. No. 109 ("Kaftarian Decl.") ¶ 9 & Ex. 2, the Sheriff's Office

3    Custody Bureau ("Custody") and other county agencies responsible for administering the jail

4    system collaborate on implementation of a suicide-prevention program in Santa Clara County

5    jails, Dkt. No. 111 ("Rodriguez Decl.") ¶ 5.  Adult Custody Health Services ("ACHS") is one such

6    county department, which employs psychiatrists, psychologists, and mental health clinicians to

7    care for individuals in custody.  *Id.* ¶¶ 5–6.  The County's suicide-prevention program is guided by

8    Titles 15 and 24 of the California Code of Regulations, which establish certain minimum

9    standards relevant to suicide prevention and jail facilities.  Dkt. No. 103 ("Harris Decl.") ¶ 13 &

10   Exs. 11, 12.

11        At the time of the events giving rise to this lawsuit, ACHS policy required that all new

12   arrivals be screened for suicide risk by a trained registered nurse.  Rodriguez Decl. ¶ 7 & Ex. 1;

13   Dkt. No. 116 ("Glazner Decl.") Ex. 22.  If the individual's responses during this initial screening

14   indicated that it was necessary, the individual could be referred to an ACHS mental health

15   clinician for a suicide-risk evaluation ("SRE"), which considered risk factors as well as protective

16   factors.  *Id.*  The SRE also inquired into whether the individual reported a desire to die or a plan to

17   kill him/herself.  *Id.*  After completing the evaluation, including reviewing the individual's

18   medical records and the reason for the referral, the ACHS clinician would determine whether—

19   and which—suicide-prevention measures should be taken, and would communicate that

20   determination to Custody.  Rodriguez Decl. ¶ 7.  The prevention measures available to clinicians

21   included the following non-exhaustive list of options: (1) placing the individual on suicide watch;

22   (2) removing the individual's possessions and clothing to reduce the risk of a ligature; and

23   (3) housing the individual in a suicide-resistant cell.  *Id.* ¶ 9–12.

24        Suicide watch involved keeping individuals at risk of suicide under observation.  *Id.* ¶ 10.

25   For example, the clinician could recommend that individuals presenting a suicide risk be checked

26   on at fifteen-minute intervals.  *Id.*  If this intervention was recommended by an ACHS clinician,

27   the fifteen-minute checks were executed by Custody.  *Id.*; Duran Decl. ¶ 15.  The checks were

28   carried out by the correctional deputies assigned to a given housing unit, *see* Harris Decl. Ex. 5

("Cote Tr.") at 62:8–24, and the objective was the observe the individual through their cell door for long enough to observe signs of life and any safety issues present in the cell, *id.* at 92:15–93:15.  While under suicide watch, individuals so designated received a daily check-in with an ACHS clinician, and the in-custody individual could also request to speak with an ACHS clinician at any time.  Rodriguez Decl. ¶ 10; Harris Decl. Ex. 2 ("Rodriguez Tr.") at 50:9–21.  ACHS clinicians could also order a psychiatry consult for individuals on suicide watch; as of July 2020, such a consult was required to occur within seven days of the referral order.  Rodriguez Decl. ¶ 10.

Removal of possessions or clothing aimed to prevent individuals at risk of suicide from using those items as a ligature.  Rodriguez Decl. ¶ 11.  If this intervention was imposed, the individual was required to be provided with a "Ferguson gown" and a "Ferguson blanket" in lieu of the removed clothing and bedding.  Rodriguez Decl. ¶ 11 & Ex. 1.  Ferguson gowns and blankets are made of a nylon material constructed to prevent tearing or rolling the items. Rodriguez Decl. ¶ 11.   By policy, issuance of Ferguson gowns and blankets is limited to individuals at a "high risk for suicide," and not as a "default or behavior management plan."  *See id.*; *see also* Harris Decl. ¶ 16 & Exs. 21 at 19, 19 at 19.  In addition, on July 21, 2020, at the recommendation of the court-appointed monitor tracking the County's compliance with a consent decree into which the County entered in 2019 in association with *Chavez et al. v. County of Santa Clara*, No. 15-cv-05277, ACHS prohibited the use of Ferguson gowns and blankets in outpatient settings, such that they could only be used in certain jail facilities.  Rodriguez Decl. ¶ 11; Rodriguez Tr. at 86:17–94:17.  This policy change was communicated to all ACHS mental health clinicians via email on July 23, 2020.  Rodriguez Tr. at 86:24–88:6 & CCO_Regal_03196–97.

Placing someone in a suicide-resistant cell involved assigning an individual at risk of suicide to a cell that aimed to remove anything that the individual could use to harm themself.  *See* Harris Decl. Ex. 6 ("Sivongxay Tr.") at 23:24–24:16.  Prior to the Consent Decree, the County did not have any suicide-resistant cells, since at the time that its facilities were constructed, the minimum design standards for local detention facilities set out in Title 24 of the California Code of Regulations did not require them.  *See* Dkt. No. 112 ("Sivongxay Decl.") ¶¶ 5–6.  However, at the time of the events underlying this litigation, the County was in the process of retrofitting its

3

facilities with suicide-resistant cells, and twelve such cells were available in the Main Jail by July 2020. *Id.* ¶¶ 7–11; Sivongxay Tr. at 52:15–25. Ten of those cells were in Unit 8A, where ACHS clinicians could direct a person to be housed if that person satisfied the criteria for placement on a "5150 hold."[1] Sivongxay Decl. ¶ 19; Rodriguez Decl. ¶¶ 12, 15. Two of those cells were in Unit 4B, and an individual could only be assigned to the 4B cells based upon an appropriate security designation by Custody's Classification Unit ("Classification")—not by ACHS—because it was a restrictive housing unit. Sivongxay Decl. ¶ 19; Rodriguez Decl. ¶ 12; Duran Decl. ¶ 14.

### B. Regal's Arrest and Intake

Regal was arrested on the morning of July 28, 2020 on various firearm- and drug-related charges. Harris Decl. Ex. 7 ("Ortega Tr.") at 18:13–17; CCO_Regal_01515; CCO_Regal_01506. Officers had been dispatched to his home, a warehouse on Monterey Road in San Jose, to investigate a reported shooting. CCO_Regal_01515; CCO_Regal_01506. Blood samples taken after Regal's arrest indicated that he had ingested cocaine, methamphetamine, and MDMA. Harris Decl. Ex. 8 ("Sobolesky Tr.") at 19:17–26:20, 30:10–31:6; CCO_Regal_00230.

After determining that Regal had no prior 5150 holds and did not meet the criteria for such a hold, the investigating officer—Ramon Ortega—transported Regal to the Main Jail. Ortega Tr. at 29:2–33:23. The Agency Advisory Form submitted at his intake indicated that Regal was not suicidal or on a mental health hold, but that he was showing signs of "Alcohol or Drug Intoxication" and "Bizarre or Aggressive Behavior." *Id.* at 50:21–53:11 & CCO_Regal_01393. Regal then underwent two intake assessments. The nursing intake assessment indicated that Regal was not suicidal or on a psychiatric legal hold, and that he had not attempted or considered suicide in the previous year nor been previously treated for mental or emotional problems. Rodriguez Decl. ¶ 13 & CCO_Regal_1396. However, the mental health intake assessment, carried out by an ACHS marriage and family therapist, stated that Regal had been referred based on depression and current suicidal ideation. CCO_Regal_1399. The intake therapist noted that Regal reported that

---

[1] Welfare and Institutions Code § 5150 allows for involuntary detention of individuals deemed to be a danger to themselves or others by reason of a mental disorder, or gravely disabled. Cal. Welf. & Inst. Code § 5150(a).

1   he had not attempted suicide in the past, but that he "does think about it, and is currently thinking

2   about it." *Id.* at 1400.  Accordingly, the therapist noted "vague" suicidal ideation and several

3   acute risk factors. *Id.* at 1401–02.  The therapist also noted certain countervailing protective

4   factors and the fact that Regal did not report a plan to kill himself. *Id.* at 1402.  Overall, Regal

5   was rated a "moderate" suicide risk. *Id.* at 1403.

6        The therapist ordered that Regal be housed in accordance with his assignment by

7   Classification, and that Custody carry out fifteen-minute precautionary wellness checks. *Id.*

8   Regal was determined not to meet the criteria for a 5150 hold, Dkt. No. 107 ("Pierce Decl.") ¶ 3,

9   so he was not eligible for housing in the acute psychiatric unit, 8A, Rodriguez Decl. ¶ 12.  He was

10  also not eligible for housing in 4B, because he did not meet the security criteria for placement in

11  that restrictive housing unit.  Duran Decl. ¶ 14; Harris Decl. Ex. 4 ("Duran Tr.") at 54:1–18.

12  Instead, Regal was assigned to Unit M5-D at the Elmwood facility.  Duran Decl. ¶ 14.  Due to the

13  COVID-19 protocols in effect at the time, Dkt. No. 110 ("Chyorny Decl.") ¶¶ 5–6, Regal was

14  required to spend his first fourteen days in custody in a risk management unit ("RMU"), which

15  Unit M5-D was, and he was assigned to a unit without a cellmate. *Id.*; *see* Dkt. No. 108

16  ("Rudman Decl.") ¶¶ 17–18.  The cell in which Regal was housed had an upper bunk and

17  bedsheets, and it did not have an internal video or audio monitoring system.  Marvin Decl. Ex. 1;

18  Glazner Decl. Ex. 20.

19       **C.  Regal's Death**

20       The fifteen-minute checks on Regal commenced at 4:45 p.m. on July 28, 2020.  Duran

21  Decl. ¶ 15 & CCO_Regal_01606.  On July 29, 2020, Deputy Omar Cevallos's shift began at 6:00

22  a.m., at which point he took over Regal's fifteen-minute checks.  Harris Decl. Ex. 9 ("Cevallos

23  Tr.") Ex. 1 (CCO_Regal_01589).  At approximately 11:47 a.m., Consuelo Garcia, an ACHS

24  licensed marriage and family therapist, reviewed Regal's medical record and met with him.  Harris

25  Decl. Ex. 10 ("Garcia Tr.") at 18:4–13 & CCO_Regal_02557.  Garcia's notes on that meeting

26  reflect that Regal reported still experiencing suicidal ideation, although he denied having a plan,

27  and ultimately she concluded that Regal still did not meet the criteria for a 5150 hold.

28  CCO_Regal_01403–04.  She determined that he remained a "moderate" suicide risk.  Garcia Tr. at

United States District Court
Northern District of California

1   39:11–15.  Based on that assessment, Garcia decided the appropriate course of action was to

2   continue the fifteen-minute checks.  Dkt. No. 105 ("Garcia Decl.") ¶ 4; Garcia Tr. at 76:16–78:9.

3   She also recommended a psychiatry referral.  Rodriguez ¶ 14.

4       Around 4:15 p.m. on July 29, 2020, Cevallos conducted a check on Regal, during which he

5   asked if Regal was doing well.  Cevallos Tr. Ex. 1 at 1590.  Regal responded that he was fine.  *Id.*

6   At approximately 4:30 p.m., Deputy Cevallos approached Regal's cell for another fifteen-minute

7   check.  *Id.*  Through the door of Regal's cell, Cevallos could see that Regal was hanging from his

8   neck by a bedsheet, which was tied to the top bunk in the cell.  *Id.*  With the assistance of others,

9   Cevallos cut Regal down and initiated CPR.  *Id.* at 1590–91.  At 4:51, Regal was transported to

10  the Santa Clara Valley Medical Center.  *Id.* at 1591.  He was placed on life support until it was

11  removed on August 5, 2020.  Dkt. No. 52 ¶ 36.

12      **D.  Procedural History**

13      Plaintiffs Devin Regal, E.R., and C.R., acting through their guardian ad litem Michael

14  Leitchman, filed suit against the County as well as County Sheriff Laurie Smith and Defendant

15  Consuelo Garcia on July 26, 2022.  Dkt. No. 1.  Devin Regal is Regal's adult son, and E.R. and

16  C.R. are Regal's minor children.  *Id.* ¶¶ 5–7.  Plaintiffs asserted six claims for relief: a 42 U.S.C.

17  § 1983 Deliberate Indifference claim; a 42 U.S.C. § 1983 Loss of Familial Association claim

18  under the First and Fourteenth Amendments; a 42 U.S.C. § 1983 Municipal Liability ("*Monell*")

19  claim based on an unconstitutional custom, practice, or policy; a 42 U.S.C. § 1983 *Monell* claim

20  based on failure to train; a 42 U.S.C. § 1983 *Monell* claim based on ratification of the actions of

21  the individual Defendants; and a claim for violation of the Americans with Disabilities Act, 42

22  U.S.C. § 12131 *et seq.*  Dkt. No. 1 ¶¶ 29–82.

23      After the Court granted in part Defendants' motion to dismiss the initial Complaint and

24  granted the Parties' stipulation to Plaintiffs' addition of Defendant Omar Cevallos, Plaintiffs filed

25  a First Amended Complaint on March 28, 2023.  Dkt. Nos. 45, 51, 52.  On October 31, 2023, the

26  Court granted in part and denied in part Defendants' second motion to dismiss and ordered

27  Defendants to answer the First Amended Complaint.  Dkt. No. 75.  The remaining claims in the

28  operative Complaint are: (1) a 42 U.S.C. § 1983 Deliberate Indifference claim against Consuelo

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Garcia; (2) a 42 U.S.C. § 1983 Loss of Familial Association claim against Consuelo Garcia; and

2   (3) a 42 U.S.C. § 1983 Municipal Liability ("*Monell*") claim based on an unconstitutional custom,

3   practice, or policy against the County.  *See* Dkt. No. 78 ¶¶ 37–86.

4        Defendants filed the present motion on October 18, 2024.  Dkt. No. 102.

5   **II.   LEGAL STANDARD**

6        Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary

7   judgment is appropriate if the evidence and all reasonable inferences in the light most favorable to

8   the nonmoving party "show that there is no genuine issue as to any material fact and that the

9   moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317,

10  322 (1986).  The current version of Rule 56 authorizes a court to grant "partial summary

11  judgment" to dispose of less than the entire case and even just portions of a claim or defense.  *See*

12  Fed. R. Civ. P. 56, advisory committee's note, 2010 amendments; *Ochoa v. McDonald's Corp.*,

13  133 F. Supp. 3d 1228, 1232 (N.D. Cal. 2015).

14       The moving party "bears the burden of showing that there is no material factual dispute,"

15  *Hill v. R+L Carriers, Inc.*, 690 F. Supp. 2d 1001, 1004 (N.D. Cal. 2010), by "identifying for the

16  court the portions of the materials on file that it believes demonstrate the absence of any genuine

17  issue of material fact," *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630

18  (9th Cir. 1987).  In judging evidence at the summary judgment stage, the Court "does not assess

19  credibility or weigh the evidence, but simply determines whether there is a genuine factual issue

20  for trial."  *House v. Bell*, 547 U.S. 518, 559–60 (2006) (Roberts, J., concurring in part).  A fact is

21  "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to

22  a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in

23  favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

24       Where the moving party will have the burden of proof on an issue at trial, it must

25  affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

26  party.  *See Celotex*, 477 U.S. at 325; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

27  Cir. 2007).  By contrast, where the moving party does not have the burden of proof on an issue at

28  trial, it "must either produce evidence negating an essential element of the nonmoving party's

1    claim or defense or show that the nonmoving party does not have enough evidence of an essential

2    element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz*

3    *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

4          Once the moving party meets its initial burden, the nonmoving party must set forth, by

5    affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue

6    for trial." *Liberty Lobby*, 477 U.S. at 250 (internal quotation marks omitted).  If the nonmoving

7    party's "evidence is merely colorable, or is not significantly probative, summary judgment may be

8    granted." *Id.* at 249–50 (internal citations omitted).  Mere conclusory, speculative testimony in

9    affidavits and moving papers is also insufficient to raise genuine issues of fact and defeat

10   summary judgment.  *See Thornhill Publ'g Co. v. General Tel. & Electronics Corp.*, 594 F.2d 730,

11   738 (9th Cir. 1979).  For a court to find that a genuine dispute of material fact exists, "there must

12   be enough doubt for a reasonable trier of fact to find for the [non-moving party]." *Corales v.*

13   *Bennett*, 567 F.3d 554, 562 (9th Cir. 2009) (internal quotations omitted).

14   **III.    DISCUSSION**

15        **A.  Consuelo Garcia was not deliberately indifferent.**

16         "Qualified immunity shields government actors from civil liability under 42 U.S.C.

17   § 1983 if 'their conduct does not violate clearly established statutory or constitutional rights of

18   which a reasonable person would have known.'" *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060,

19   1066 (9th Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  When evaluating

20   an assertion of qualified immunity, "a court considers whether (1) the state actor's conduct

21   violated a constitutional right and (2) the right was clearly established at the time of the alleged

22   misconduct." *Gordon v. Cnty. of Orange* ("*Gordon II*"), 6 F.4th 961, 967–68 (9th Cir. 2021).

23   "Either question may be addressed first, and if the answer to either is 'no,' then the state actor

24   cannot be held liable for damages." *Id.* at 968.  The Court begins with the first question: whether

25   Garcia's conduct violated Regal's constitutional rights.

26         "[T]he elements of a pretrial detainee's medical care claim against an individual defendant

27   under the due process clause of the Fourteenth Amendment are":

28              (i) the defendant made an intentional decision with respect to the conditions under which
                the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of

United States District Court
Northern District of California

suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) ("*Gordon I*").  "[T]he plaintiff must 'prove more than negligence but less than subjective intent—something akin to reckless disregard.'"  *Id.* (quoting *Castro*, 833 F.3d at 1071).  The third factor—whether the defendant took reasonable available measures to abate the risk—is objective.  *See id.*

Defendants argue that Plaintiffs cannot establish the third factor of the deliberate indifference analysis, because that "formidable" standard requires Plaintiffs to be able to show that a treatment chosen by Garcia was "medically unacceptable under the circumstances and that [she] chose [it] in conscious disregard of an excessive risk to [Regal's] health."  Mot. at 16 (citing *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 636 (9th Cir. 2021), and *Gordon II*, 6 F.4th at 970).  Because Garcia "concluded that Regal had suicidal ideations but did not have a plan and therefore did not qualify for a 5150 hold," Garcia "exercised her clinical judgment to conclude that maintaining checks was the only appropriate clinical choice" available to her—a choice which Defendants argue was "well within the standard of care."  *Id.*  In response, Plaintiffs argue that "other reasonable measures were available to Garcia that she failed to order," including bedsheet removal.  Opp. at 12–14.

The Court concludes that there were no "reasonable alternative measures" available to Garcia regarding Regal's care, so Plaintiffs cannot establish the third factor of the deliberate indifference analysis.  As a preliminary matter, Plaintiffs do not dispute that Regal was properly categorized as presenting a case of "moderate" suicide risk.  Opp. at 12.  This categorization—and the facts on which it was based—defined the appropriate measures available for Regal's care.  Specifically, under ACHS policy as of July 29, 2020, Ferguson gowns and blankets could be issued only to *high*-risk individuals, and they were required to be issued together.  Rodriguez Decl. ¶ 11; Rodriguez Tr. at 86:17–93:16.  The undisputed facts show that Regal lacked a plan for attempting suicide and that his behavior and other protective factors supported Garcia's conclusion that he was not a candidate for a 5150 hold or for categorization as high-risk.  Garcia Tr. Ex. 1 at

9

United States District Court
Northern District of California

1404.  As a result, Garcia believed that her only option was to continue (or discontinue) the fifteen-minute checks.  Garcia Tr. at 76:16–77:8.  She ordered that they continue.  Garcia Decl. ¶¶ 3–4.

Plaintiffs' argument that Garcia could and should have ordered removal of Regal's bedsheets, *see* Opp. at 13, is misplaced.  Plaintiffs attempt to assert that removal of bedsheets was still an option available to Garcia even after the change in policy related to Ferguson gowns and blankets, *id.*, but the evidence presented demonstrates that Plaintiffs are incorrect.  Under ACHS policy, bedsheets could not be removed without being replaced with a substitute—namely, a Ferguson blanket.  Rodriguez Decl. ¶ 11; Rodriguez Tr. at 86:17–93:16.  As Defendants' expert explains, "[i]t might be reasonable to remove standard bedsheets and regular clothing from individuals who pose a high suicide risk . . . [i]n such situations, human dignity and the law require that individuals be issued alternative clothing (a Ferguson gown) and bedding (a Ferguson blanket)."  Kaftarian Decl. ¶ 25.  Therefore, even if mental health providers had authority and discretion to remove certain items from inmates' cells in order to abate a risk of suicide, *see* Glazner Decl. Ex. 25 at 427:24–428:19 & CCO_Regal_07370, this discretion did not extend to removing bedsheets *without* offering a Ferguson blanket as a substitute.  And as of the date that Garcia evaluated Regal, Ferguson blankets could only be issued in the Acute Psych Unit (8A).  Rodriguez Tr. at 86:17–93:16 & CCO_Regal_03197.  Plaintiffs' suggestion otherwise is based on an outdated policy: prior to July 21, 2020, ACHS permitted the use of Ferguson gowns and Ferguson blankets across jail facilities.  On that date, however, ACHS adopted a new policy restricting their use to Unit 8A.  Rodriguez Tr. at 55:7–57:4.  All ACHS mental health clinicians were informed of this change by July 23, 2020, several days before Regal's death.  *See* CCO_Regal_03196–98.  In other words, as of July 29, 2020, removing bedsheets alone was not a preventative option for an ACHS clinician evaluating a moderate-risk patient, so it was not a "reasonable *available* measure[]" that Garcia could have ordered to abate Regal's risk of suicide.  *See Gordon I*, 888 F.3d at 1125 (emphasis added).

Similarly, contrary to Plaintiffs' arguments, *see* Opp. at 14, Garcia could not order that Regal be placed in a suicide-resistant cell.  As an ACHS clinician, Garcia did not have the

1    authority to order someone to be housed in Unit 4B, which was restrictive housing for high-

2    security individuals.  *See* Rodriguez Decl. ¶ 12; Duran Decl. ¶¶ 6–7, 14.  Moreover, both policy

3    and law require that people be housed in the *least restrictive* conditions consistent with their

4    classification, *see* Duran Decl. ¶ 6, and Regal's classification—which Plaintiffs do not

5    challenge—would not have been consistent with placement in Unit 4B.  While Garcia did have

6    authority to order that someone be housed in Unit 8A, Rodriguez Decl. ¶ 12, that designation was

7    only permitted if someone qualified for a 5150 hold, which Regal did not.  *Id.* ¶ 8; *see* Cal. Welf.

8    & Inst. Code § 5150(a).  Accordingly, Garcia did not have the option of ordering Regal to be

9    housed in either of the facilities that had suicide-resistant cells.

10           With the benefit of hindsight, Plaintiffs argue that a more restrictive housing placement or

11    more restrictive custodial conditions might have prevented Regal's tragic death.  However, the

12    Court must be careful not to confuse hindsight with the options that were actually available to

13    Garcia on July 29, 2020.  At the time that she assessed Regal's condition, Garcia correctly

14    considered the only options available to her based on Regal's undisputedly correct classification as

15    having a moderate suicide risk: (1) continue the fifteen-minute checks; (2) discontinue the fifteen-

16    minute checks; (3) place Regal on a 5150 hold, and/or (4) refer Regal for a consult with a

17    psychiatrist.  *See* Garcia Tr. at 76:16–77:8; Rodriguez Decl. ¶ 10.  After finding that Regal was not

18    a candidate for a 5150 hold, Garcia Tr. at 80:24–81:9 & CCO_Regal_01404, Garcia exercised her

19    discretion to continue the checks and submit a psychiatry consult request.  *See* Garcia Tr. at

20    76:16–77:8; Garcia Decl. ¶ 4; Rodriguez Decl. ¶ 14.  This course of action is not "akin to reckless

21    disregard," *Gordon I*, 888 F.3d at 1125, and does not rise to the level of showing that Garcia was

22    deliberately indifferent to an obvious risk of harm to Regal.

23           Post-*Gordon I* cases support the conclusion that Garcia's conduct was not deliberately

24    indifferent.  Looking to those cases, the Court concludes that Regal's tragic situation was

25    meaningfully different from the facts present where courts in this circuit have found that a

26    clinician providing services to a person in custody acted with deliberate indifference.  For

27    example, in *Sandoval v. County of San Diego*, the deputies from the Sheriff's Department who had

28    arrested Sandoval were not aware that he had swallowed "several hundred times the typical

11

recreational dose" of methamphetamine shortly before his arrest.  985 F.3d 657, 662 (9th Cir. 2021).  However, in custody Sandoval was "sweating a lot and appeared to be very tired and disoriented," and also "became agitated and refused to answer further questions" after being asked if he had swallowed anything.  *Id.*  Although the defendant nurse was expressly told that he needed to look at the individual "more thoroughly" than the intake nurse, who had done only a brief blood sugar test, the nurse simply took a second "very quick" blood sugar test and then "left the cell without conducting any further examination."  *Id.* at 662–63.  The nurse then suggested that Sandoval be placed in a "sobering tank," suggesting that he suspected that Sandoval may have ingested drugs or alcohol.  *Id.* at 663.  But despite that suspicion, the nurse "did not check on Sandoval at any point during the remaining six hours of his shift" and did not tell the next shift of nurses anything about Sandoval.  *Id.*  On those facts, the Ninth Circuit determined that the nurse's actions were "akin to reckless disregard," and that therefore the nurse was not entitled to summary judgment on liability.  *Id.* at 670.

In another case involving prison officials' failure to provide medical care, the plaintiff was "assaulted by 30 to 40 inmates who knocked him unconscious" and left him with "a bloody nose and swollen face," "fainting from severe pain in his left shoulder, left hip, and left ribs," and "severe stomach pain with rectal bleeding."  *Voskanyan v. McDonnell*, No. 15-cv-06259, 2021 WL 1235032, at *4–5 (C.D. Cal. Feb. 10, 2021), *report and rec. adopted*, No. 15-cv-06259, 2021 WL 1235030 (C.D. Cal. Mar. 10, 2021).  After seeking medical care, he was "left alone for eight hours in [a] wheelchair" and then "hidden" instead of being taken to the hospital.  *Id.* at *5.  The court found that "a reasonable jail official who was informed that Plaintiff continued to suffer serious symptoms, including fainting, vomiting, difficulty ambulating, and chronic pain, would have understood that he faced a 'substantial risk of suffering serious harm,' [*Gordon I*,] 888 F.3d at 1125, and needed prompt medical care."  *Id.* at *13.  The failure to provide that medical care evinced deliberate indifference.

The Court concurs with Defendants' characterization of the facts in these cases as indicating an intentional decision to abandon an incarcerated person "to the perils of jail life" despite a clear indication that the person likely needed prompt and careful medical care.  *See* Mot.

1    at 17.  In Regal's case, in contrast, the Parties are in agreement that Garcia correctly concluded

2    that Regal was at "moderate" risk of suicide.  Based on that evaluation, Garcia determined that

3    fifteen-minute checks should continue to monitor Regal's status, but prior to Regal's attempt, it

4    was not clear that he urgently or imminently required a more dramatic intervention, like a 5150

5    hold or a Ferguson gown.  While it sadly turned out that Regal *did* come up with and carry out a

6    suicide plan, that ultimate reality does not change the fact that the undisputed evidence shows that

7    Garcia's assessment and determination at the time she evaluated Regal was reasonable.  She

8    certainly did not abandon Regal or act in a manner "akin to reckless disregard."

9        Finding no constitutional violation by Garcia, the Court need not consider the second

10    prong of the qualified immunity analysis.  Accordingly, the Court GRANTS summary judgment to

11    Defendant Consuelo Garcia on Plaintiffs' deliberate indifference claim.

12        **B.  Consuelo Garcia's conduct does not "shock the conscience."**

13        "Parents and children may assert Fourteenth Amendment substantive due process claims if

14    they are deprived of their liberty interest in the companionship and society of their child or parent

15    through official conduct."  *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir.

16    2013) (citing *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).  "Only official conduct that

17    '*shocks the conscience*'" will support this form of due process liability.  *Id.* (quoting *Porter v.

18    Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)) (emphasis added).  "A prison official's deliberately

19    indifferent conduct will generally 'shock the conscience' so as long as the prison official had time

20    to deliberate before acting or failing to act in a deliberately indifferent manner."  *Id.* (citing

21    *Tennison v. City and Cnty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009)).

22        The Court has already determined that Garcia's conduct does not meet the "deliberate

23    indifference" standard.  A familial loss claim like Plaintiffs' is derivative of a deliberate

24    indifference claim; thus, the grant of summary judgment in Defendant Garcia's favor on the

25    deliberate indifference claim also secures summary judgment for Garcia on the familial loss claim.

26        **C.  There are disputed facts on Plaintiffs' *Monell* claim against the County.**

27        "The Supreme Court in *Monell* held that municipalities may only be held liable under

28    section 1983 for constitutional violations resulting from official county policy or custom."

United States District Court
Northern District of California

United States District Court
Northern District of California

1  *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (citing *Monell v. Dep't of*

2  *Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)).  "In particular, municipalities may be

3  liable under § 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive

4  practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final

5  policymaker."  *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602–03 (9th Cir. 2019).

6       To impose *Monell* liability on a municipality under section 1983, a plaintiff must prove:

7  (1) the plaintiff had a constitutional right of which he was deprived; (2) the municipality had a

8  policy; (3) the policy amounts to deliberate indifference to his constitutional right; and (4) the

9  policy is the moving force behind the constitutional violation.  *Gordon II*, 6 F.4th at 973 (quoting

10  *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)).  A policy of inaction may

11  amount to deliberate indifference to the plaintiff's constitutional right if the government entity was

12  "on actual or constructive notice that its omission would likely result in a constitutional violation."

13  *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1145 (9th Cir. 2012) (citation omitted).  The standard

14  regarding actual or constructive notice is an objective one.  *Castro*, 833 F.3d at 1076.

15       In the motion for summary judgment, the County argues first that Plaintiffs cannot show

16  that Regal "suffered a 'constitutional deprivation,'" because "Garcia did not treat Regal with

17  deliberate indifference and thus did not violate his constitutional rights."  Mot. at 20 (citing

18  *Castro*, 833 F.3d at 1075).  The County goes on to argue that Plaintiffs are challenging the

19  sufficiency of the County's suicide prevention program, but (1) evaluation of its sufficiency

20  "cannot be made from *ex post facto* perspective," and (2) there are no specific metrics "dictating

21  what constitutes an 'adequate' suicide-prevention program."  *Id.* at 20–21.  In response, Plaintiffs

22  argue that their *Monell* claim is actionable regardless of Garcia's liability.  Opp. at 14.  In addition,

23  Plaintiffs argue that they are not conducting an "*ex post facto*" analysis, but rather arguing that the

24  County's longstanding knowledge of the "clear risk of suicide by hanging from the obvious

25  anchor point of the bunk bed" establishes that the County's policy was deliberately indifferent to

26  the risk Regal was facing.  *Id.* at 15–16.

27       As a preliminary matter, Plaintiffs are correct that the Court need not find Garcia liable in

28  order for Plaintiffs to maintain their *Monell* claim against the County.  "[M]unicipal defendants

may be liable under § 1983 even in situations in which no individual officer is held liable for violating a plaintiff's constitutional rights," since, for example, the constitutional violation may occur "'not . . . as a result of actions of the individual officers, but as a result of the collective inaction' of the municipal defendant." *Horton*, 915 F.3d at 604 (citing *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002)). The County agrees that the rule does not require a finding of individual officer liability for a *Monell* claim to proceed. Reply at 6. Thus, the fact that the Court has granted summary judgment in favor of Garcia has no bearing on the validity of Plaintiffs' *Monell* claim.

### 1. Whether Regal had a Constitutional Right that was Violated

The first factor of the *Monell* test asks whether a plaintiff possessed "a constitutional right of which he was deprived." *Gordon II*, 6 F.4th at 973. On this factor, Defendants argue that Plaintiffs effectively seek to "mandat[e] specific suicide prevention protocols," and that there is no constitutional right to specific preventative measures. Mot. at 21. However, the Court disagrees with Defendants' characterization of Plaintiffs' argument. As Plaintiffs expressly state in their Opposition, Plaintiffs' theory is that "Regal had a Fourteenth Amendment right to *reasonable measures* to abate his [known] risk of suicide, and the County failed to provide" such reasonable measures. Opp. at 16 (emphasis added).

Thus characterized, the Court finds that there are disputed facts as to whether Regal was deprived of a constitutional right. The right itself is not in question: in the Order Granting in Part and Denying in Part Motion to Dismiss First Amended Complaint, Without Leave to Amend, the Court already found that "pretrial detainees have a Fourteenth Amendment right to be housed with reasonable measures in place to abate a known risk of suicide." Dkt. No. 75 at 7 (citing *Conn v. City of Reno*, 591 F.3d 1081 (9th Cir. 2010), *cert. granted, judgment vacated sub nom. City of Reno v. Conn*, 563 U.S. 915 (2011), *and opinion reinstated*, 658 F.3d 897 (9th Cir. 2011); *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016); and *Gordon v. Cnty. of Orange*, 888 F.3d 1118 (9th Cir. 2018)). At the summary judgment stage, the question is whether the County's custom and practice or formal policy *deprived* Regal of this right.

The County submits evidence of its long-extant suicide-prevention program, which

15

includes "training, intake screening, communication protocols between Custody and ACHS, housing options, numerous suicide-prevention measures, and various quality-improvement measures coupled with multi-disciplinary review." Mot. at 20 (citing Rodriguez Decl. ¶ 5; Duran Decl. ¶ 5). As such, the County has submitted undisputed evidence that it has taken various steps to abate a *general* risk of suicide to at least certain members of its custodial population. *See* Rodriguez Decl. ¶¶ 5–12 & CCO_Regal_01936–41. However, Plaintiffs highlight that, at the time of Regal's death, the County appeared to have a practice of housing moderately suicidal individuals in cells with obvious hanging points, and that the County's written policies did not require additional protective measures to be undertaken when an individual at risk of suicide was placed in a cell with obvious hanging points. Opp. at 17–18 (citing Glazner Decl. Ex. 22). This point is enough to carry Plaintiffs' burden at summary judgment. While the County is correct that there is no constitutional right to any *particular* level of suicide-prevention care, *see* Reply at 7, it is not the case that simply providing any suicide-prevention care at all absolves the County of liability. Rather, as the County acknowledges, the question is whether the contours of the provided suicide-prevention measures are commensurate with risks about which the County is aware. *See id.* (citing *Est. of Abdollahi v. Cnty. of Sacramento*, 405 F. Supp. 2d 1194, 1205–06 (E.D. Cal. 2005)). Therefore, Plaintiffs need only show that there is "enough doubt for a reasonable trier of fact to find for [them]," *Corales*, 567 F.3d at 562, on whether the County's practices related to housing suicidal individuals in cells with obvious hanging points fell short of providing reasonable measures to abate a known risk of suicide.

Here, the Court concludes that a reasonable finder of fact could look at the presented evidence and determine that the County failed to adopt reasonable measures to abate the risk of suicide to a moderate-risk individual like Regal. Thus, the Court is unable to find as a matter of law that the County is not liable. Instead, ascertaining whether the County's suicide-prevention measures were reasonable or not falls into the province of the jury.

### 2. Whether the County had a Policy or a Custom and Practice

The second factor of the *Monell* test asks whether the County had a policy (or practice) on which liability may be based. *See Gordon II*, 6 F.4th at 973. Regarding this factor, it is necessary

1    to spend a moment unpacking the Parties' respective understandings of Plaintiffs' *Monell* theory

2    as to how the County deprived Regal of his constitutional right, because the Parties sometimes

3    talked past one another on this point during the summary judgment briefing and oral argument.

4         Specifically, Defendants appear to argue the *Monell* issue primarily based on the *existence*

5    of County's written policy.  *See* Mot. at 20.  The County argues that the "*Monell* analysis should

6    end" at the point of finding that (1) the County had a suicide-prevention program, and (2) there is

7    no specifically mandated level of suicide-prevention care.  *Id.* at 20–21.  But this argument fails to

8    consider that Plaintiffs' *Monell* theory is actually based on the County's custom and practice of

9    housing individuals at moderate suicide risk in cells with obvious hanging points, and on the

10   County's written policies insofar as they *omit* requirement of additional precautions when a

11   moderately suicidal inmate is housed in a cell with an obvious hanging point.  *See* Opp. at 16.  In

12   other words, while the County may have a robust suicide-prevention program that offers many

13   protective measures (particularly for those at *high* risk of suicide), the asserted problem is that the

14   program does not include sufficient protective measure options for those at *moderate* risk of

15   suicide.  Given this gap in the written policy, Plaintiffs' theory for trial is that the custom and

16   practice of housing individuals at moderate risk of suicide in cells with obvious hanging points—

17   and the written policy insofar as it omits mention of the need for suicide precautions in addition to

18   fifteen-minute visual checks and daily mental health assessments in cases where a moderately

19   suicidal individual is placed in a cell with obvious hanging points—is deliberately indifferent to

20   those individuals' constitutional right to be housed with reasonable measures to abate their risk of

21   suicide.

22        When determining whether to grant or deny a motion for summary judgment, the Court

23   considers the theory or theories of liability as developed by the plaintiffs.  In this case, the Court

24   finds that Plaintiffs have successfully identified a policy and/or a custom and practice on which

25   liability might be based.

26   **3.  Whether the County's Policy or Custom and Practice was Deliberately Indifferent**

27        The third factor of the *Monell* test asks whether the County's policy (or practice) was

28   deliberately indifferent to Regal's constitutional right.  *See Gordon II*, 6 F.4th at 973.  As

*United States District Court*
*Northern District of California*

17

1    persuasive authority suggests, "[w]hether or not the measures taken by jailers are sufficient to

2    preclude a finding of deliberate indifference . . . must be determined by considering the measures

3    taken in light of the practical limitations on jailers to prevent inmate suicides." *Rellergert by*

4    *Rellergert v. Cape Girardeau Cnty.*, 924 F.2d 794, 796 (8th Cir. 1991).  While this assessment

5    cannot be "*ex post facto*," it requires a fact-specific assessment of whether the preventative

6    measures effectuated were reasonable in light of specific known suicide risks.  *See id.*  It is not as

7    simple as checking the box of providing a suicide-prevention program in response to the general

8    risk of suicide facing all those held in jail custody.  Rather, "each case turns on its own peculiar

9    facts."  *Id.* at 797.

10    For this reason, the Parties have submitted competing evidence regarding what protective

11    measures might have been available to the County.  For example, Plaintiffs argue that "[t]he

12    County . . . could have modified cells to remove the bunk bed . . . and replace[] it with a single

13    bunk and/or closed the gap between the upper bunk bed and the wall."  Opp. at 24.  Plaintiffs

14    submit that this kind of modification was possible and required "only hours of actual labor."  *Id.*

15    (citing Glazner Decl. Ex. 15 at 36:19–37:20).  Alternatively, Plaintiffs say that the Elmwood

16    Facility, where Regal was housed, had 32 cells with single beds.  *Id.*; *see* Glazner Decl. Ex. 19 at

17    9.  They suggest that simply housing Regal in a single-bed cell would have been a reasonable

18    alternative measure, although they admit that it is not clear whether any of those cells was

19    available when Regal was in custody.  *Id.*  Another preventative measure that Plaintiffs think the

20    County should have considered was "staggered" suicide watch checks, which Plaintiffs say the

21    County did not carry out.  Opp. at 19 (citing Glazner Decl. Exs. 3, 37).  Or, Plaintiffs say, the

22    County could have declined to eliminate the use of Ferguson blankets alone for individuals at

23    moderate risk of suicide, Opp. at 20, or could have constructed more suicide-resistant cells more

24    quickly, *id.* at 21.

25    Defendants attempt to counter each proposed alternative measure.  For example, Plaintiffs'

26    evidence includes a video exhibit depicting the fifteen-minute checks on Regal, and Defendants

27    argue based on the video that Regal's checks *were* staggered—occurring at unpredictable intervals

28    of varying lengths.  Reply at 13; *see* Dkt. No. 117 ("Marvin Decl.") ¶ 4 & Ex. 1.  Additionally,

United States District Court
Northern District of California

1   Defendants respond to Plaintiffs' proposal regarding modification of bunk beds with evidence that

2   "replacing the bunk bed with a single bunk . . . would 'disrupt[] the sheriff's operation[s].'"  Reply

3   at 14 (citing Glazner Decl. ¶ 15 & Ex. 15 at 69:21–70:6).  Defendants also point to evidence that

4   individuals in custody have used single-bunk beds as anchor points for suicides by hanging, Harris

5   Decl. Ex. 1 ("Perumattam Tr."), Ex. 5 at 5514, and that window bars are a "frequently used

6   hanging point in jail suicides" that would not be addressed by removal of a bunk bed, Harris Decl.

7   ¶ 16 & Ex. 19 at 15.

8          The Court need not exhaustively analyze each of the Parties' examples.  Suffice it to say,

9   this competing evidence—of potential protective measures the County might have considered as

10   well as the practical limitations on the use of those measures—indicates that there is a genuine

11   issue for trial regarding whether the County's policy or practice was deliberately indifferent.  On

12   top of that, there is a dispute of fact on the question of notice.  As the County itself points out,

13   "[c]ourts addressing the contours of a suicide-prevention program have generally required a

14   showing of deliberate indifference to *known risks*," rather than a showing of specific identified

15   measures.  Mot. at 20 (citing *Est. of Abdollahi*, 405 F. Supp. 2d at 1205–06) (emphasis added).

16   After all, the question regarding an entity's "deliberate indifference" is whether the government

17   entity was "on actual or constructive notice that its omission would likely result in a constitutional

18   violation."  *See Tsao*, 698 F.3d at 1145.

19          The Parties dispute whether the County had adequate notice of the particular suicide risks

20   Plaintiffs identify.  Namely, Plaintiffs have submitted evidence showing that "all 12 of the suicide

21   deaths by hanging in the County's jails from 2011-2020 occurred in regular cells, and 9 of those

22   inmates used the upper bunk of the bed as a hanging point."  Opp. at 17 (citing Glazner Decl. Ex.

23   2 at 121:4–122:17, 135:6–10; Exs. 5–14[2]).  Nine of the individuals who completed suicide by

24   hanging used a bedsheet as a ligature.  In addition, Plaintiffs have submitted evidence that the

25   County had engaged a suicide prevention expert—Lindsay Hayes—who told the County in

26

27   _____
     [2] The County objects to these exhibits to the Glazner Declaration on hearsay grounds.  The Court
28   need not resolve this objection, because it does not rely on the contents of the exhibits in finding a
     dispute of material fact.  Rather, the data underlying the dispute of fact as to notice is available in
     Defendants' own evidence.  CCO_Regal_05513–14; Harris Decl. Ex. 21.

United States District Court
Northern District of California

1    February 2016 that "the overwhelming majority of suicide attempts in custody [are] by hanging."

2    Glazner Decl. Ex. 3, att. 2 at PLTFS_000620.  Hayes also suggested to the County that individuals

3    who express suicidal ideation should be "observed by staff at staggered intervals not to exceed

4    every 10 minutes," since "brain damage from asphyxiation can occur within four minutes, with

5    death often resulting within five to six minutes."  *Id.*  Based on this background information,

6    Plaintiffs argue that it was deliberately indifferent for the County not to consider Plaintiffs'

7    various example preventative measures—removal of bedsheets, housing moderately suicidal

8    individuals in suicide resistant cells, staggered checks, and modification of bunk beds.  *See* Opp. at

9    19–24.

10          In an effort to counter Plaintiffs' evidence on notice, the County points out that "the jail

11    had *no* suicide-resistant cells when 10 of the 12 suicides occurred, and had only limited suicide-

12    resistant cells at the time of the other two."  Reply at 10 (citing Glazner Decl. ¶ 15 & Ex. 15 at

13    15:15–25) (emphasis added).  In other words, the County suggests that it lacked clear

14    counterfactual data showing that suicides were prevented or discouraged by suicide-resistant cells.

15    However, Plaintiffs carried their burden to present evidence sufficient for a reasonable trier of fact

16    to find in their favor on the notice issue, and Defendants "must either produce evidence negating

17    an essential element of the nonmoving party's claim or defense or show that the nonmoving party

18    does not have enough evidence of an essential element to carry its ultimate burden of persuasion at

19    trial."  *Nissan Fire*, 210 F.3d at 1102.  Defendants have not done so, and therefore the Court finds

20    that there is a genuine dispute of material fact as to whether the County's own data about

21    frequency and method of suicide for individuals being held in custody put it on actual or

22    constructive notice that placing individuals at a moderate risk for suicide in cells with obvious

23    hanging points without other preventative measures would likely result in a constitutional

24    violation.

25          In short, there are disputed facts regarding whether the County's policy or custom and

26    practice was deliberately indifferent to Regal's constitutional right to be housed with reasonable

27    measures in place to abate a known risk of suicide, so it is not appropriate for the Court to resolve

28    this factor of the *Monell* analysis at the summary judgment stage.

United States District Court
Northern District of California

1    **4.   Whether the County's Policy was the "Moving Force" Behind the Injuries**

2         The final factor of the *Monell* test asks whether the identified policy was the "moving force

3    behind the constitutional violation."  *See Gordon II*, 6 F.4th at 973.  "In order to be a 'moving

4    force' behind [the plaintiff's] injury," the "identified deficiency" in the County's policies would

5    need to be "closely related to the ultimate injury."  *Gibson v. Cnty. of Washoe*, 290 F.3d 1175,

6    1196 (9th Cir. 2002), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d

7    1060 (9th Cir. 2016) (citation omitted).  Again, there are disputed facts precluding summary

8    judgment on this factor of the analysis.

9         The County argues that Plaintiffs' various proposed interventions are not closely enough

10   related to Regal's death to make their omission the "moving force" behind the alleged

11   constitutional violation.  For example, the County says that a suicide prevention consultant relied

12   upon by Plaintiffs acknowledged that ligatures can be affixed to many protrusions in cells, not just

13   upper bunks, so the removal of an upper bunk bed is a "half-measure" that "would not have

14   mitigated the risk."  Mot. at 21–22 (citing Harris Decl. ¶ 16 & Ex. 19 at 15).  Similarly, the

15   County argues that Plaintiffs' proposed measure of removing only bedsheets—and not also

16   clothing—is both contrary to policy and another half-measure, because if just a bedsheet is

17   removed, an at-risk individual could still use their clothing as a ligature.  *Id.* at 24–25.  In their

18   Opposition brief, Plaintiffs do not specifically analyze the "moving force" factor of the test, but

19   the Court understands their position to be that their proposed suicide-prevention measures are

20   sufficiently "closely related" to Regal's death to be the "moving force" behind the violation they

21   allege.

22        In order to assess this final factor, it is first necessary to determine whether Regal's

23   constitutional right was violated.  Only then can the finder of fact ascertain whether the identified

24   policy or custom was the "moving force" behind the alleged constitutional violation.  Here,

25   because there are disputed facts about whether the County deprived Regal of his constitutional

26   right, there are likewise disputed facts regarding whether the County's actions (or omissions) were

27   "closely related to the ultimate injury."  *Gibson*, 290 F.3d at 1196.

28

United States District Court
Northern District of California

**5. Plaintiffs' Request to Amend Their Familial Loss Claim**

In their Opposition to Defendants' motion for summary judgment, Plaintiffs request that they be given leave to amend to add the County to the familial loss claim, as the County was omitted only due to a pleading error.  Opp. at 24.  Plaintiffs argue that correction of this error will not require additional discovery or evidence, and will not affect the Parties' arguments, but that it will permit Plaintiffs to seek individual damages for the loss of their father against the County.  *Id.* at 25.  At the hearing on Defendants' motion for summary judgment, the Court instructed Plaintiffs to either seek a stipulation to add the County to the familial loss claim, or file their request to amend by separate motion.  Dkt. No. 130 at 56:25–57:20.  Accordingly, the Court will not rule on the request to amend at this time.

**IV.    ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.  Defendants' motion for summary judgment on all claims against Defendant Consuelo Garcia is GRANTED; and

2.  Defendants' motion for summary judgment on Plaintiffs' *Monell* claim against the County is DENIED.


**IT IS SO ORDERED.**


Dated:  April 2, 2025

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

22