UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

DEVIN REGAL, et al.,

               Plaintiffs,

      v.

COUNTY OF SANTA CLARA,

               Defendant.

Case No.  5:22-cv-04321-BLF

**ORDER ON MOTIONS *IN LIMINE***

[Re: Dkt. Nos. 146, 147, 148, 149, 150, 151, 152, 153, 154, 155]

This is a civil rights action under Section 1983 brought by Devin Regal and his siblings E.R. and C.R., by and through their guardian ad litem Michael Leitchman (collectively, "Plaintiffs").  Plaintiffs bring claims individually and as successors in interest to their father, Frederick Inea Regal ("Regal"), who died by suicide while held in custody at a County of Santa Clara ("Defendant" or "the County") jail facility.  The Court held a Final Pretrial Conference in this case on May 23, 2025, during which the Court issued oral rulings on the Parties' motions *in limine*.  *See* Motions, Dkt. Nos. 146, 147, 148, 149, 150, 151, 152, 153, 154, 155.  The Court's rulings on the motions *in limine* are summarized as follows.

## I.    PLAINTIFFS' MOTIONS *IN LIMINE*

### A.  Plaintiffs' Motion *in Limine* No. 1 to Admit Evidence of Subsequent Remedial Suicide Prevention Measures to Prove Feasibility of Such Measures

In Plaintiffs' first motion *in limine*, they request an order permitting admission of "evidence of subsequent remedial suicide prevention measures defendant County of Santa Clara implemented after July 29, 2020 . . . to prove the feasibility of such measures." Dkt. No. 146 ("Plfs.' MIL No. 1") at 1.  Plaintiffs argue that, while Federal Rule of Evidence 407 does not permit introduction of evidence of subsequent remedial measures to prove negligence, culpable conduct, a defect, or a need for a warning or instruction, such evidence may be admitted to show

"feasibility of precautionary measures." *Id.* at 1–2.  In this case, Plaintiffs wish to present evidence at least of "suicide-resistant cells in the Elmwood Men's Facility, relaxed admission criteria for admission to Unit 8A . . . and the use of safety blankets in lieu of bedsheets." *Id.* at 2.

In opposition, Defendant argues that Plaintiffs have failed to adequately identify the evidence they wish to admit, and that, in any event, it should be excluded as irrelevant and unduly prejudicial.  Dkt. No. 161 ("Opp. to Plfs.' MIL No. 1").  As a preliminary matter, Defendant argues that "Plaintiffs incorrectly frame the County's construction of suicide-resistant cells at Elmwood as a subsequent remedial measure," since "it was building suicide-resistant cells across its jail system before, during, and after Regal's time in custody." *Id.* at 2.  Accordingly, Defendant "reserves the right to object" to evidence related to that construction effort, but states that it "does not run afoul of Rule 407[]." *Id.* at 2–3.

As to the evidence related to changed 8A admission criteria and the County's Ferguson gown policy, though, the County argues that this evidence does not fall into the Rule 407 feasibility carve-out. *Id.* at 3.  Regarding 8A, Plaintiffs elicited deposition testimony that at some point after Regal's death, 8A was changed from a Lanterman-Petris-Short Act ("LPS") facility for housing individuals on "5150 holds" to a non-LPS facility, which eliminated the attendant LPS admission criteria for individuals housed there. *Id.* at 3–4.  But because Plaintiffs did not conduct further discovery on this issue, Defendant argues, Plaintiffs do not know what the new criteria were, whether Regal would have been admitted to 8A under them, and whether they would have made his death by suicide less likely to occur. *Id.* at 4.  Regarding the County's use of Ferguson blankets, the County says that it "is unaware of any discovery on this subject, pertaining to this timeframe, and would seek an offer of proof." *Id.*  Moreover, Defendant argues that "[a]ny probative value of evidence of suicide-prevention measures implemented by the County after Regal's incarceration" should be excluded under Rule 403, because it would encourage the jurors to measure the adequacy of the County's performance "against the wisdom of 20/20 hindsight" and might confuse or mislead them. *Id.* at 5.

Under Federal Rule of Evidence 407, "[w]hen measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible

to prove: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction."  Fed. R. Evid. 407.  However, "the court may admit this evidence for another purpose, such as impeachment or—if disputed—proving ownership, control, or the feasibility of precautionary measures."  *Id.*  Regardless of a piece of evidence's admissibility under Rule 407, under Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

The Court understands Defendant's opposition brief to concede that evidence of the County's construction of suicide-resistant cells is generally relevant and admissible.  And the County also will introduce evidence of its jail construction efforts before and after Regal's death.  *See* Opp. to Plfs.' MIL No. 1 at 2.  Accordingly, the Court GRANTS Plaintiffs' motion insofar as it pertains to the construction of suicide-resistant cells WITHOUT PREJUDICE to Defendant asserting a Rule 403 or other appropriate objection at trial.

However, the Court must defer its ruling regarding the Unit 8A admission criteria and the Ferguson blanket policy until those issues arise at trial.  Plaintiffs were unable to clearly identify the evidence they endeavor to admit under this motion at the Final Pretrial Conference, because it pertains to new testimony that they hope to elicit for the first time at trial.  Specifically, Plaintiffs' counsel explained that Plaintiffs intend to question certain witnesses about whether the County changed its policies related to Unit 8A admission and Ferguson blankets after the date on which Regal died.  Counsel was uncertain of how the witnesses would respond to these questions, but—based on vague deposition testimony—expects the line of questioning to reveal that those policies did change after Regal's death.

Without knowing whether any such subsequent policy changes would have had an impact on Regal's housing placement or the preventative measures adopted to abate his risk of suicide, the Court is unable to rule on whether the evidence is admissible to show feasibility.  As a preliminary matter, Plaintiffs will need to lay a proper foundation for their belief that the witnesses in question actually know of any subsequent policy changes.  If they can, the Court will then be

1  able to consider whether the evidence is relevant, whether it demonstrates feasibility, and whether

2  it should be excluded under Rule 403.  In short, once the evidence Plaintiffs aim to admit is made

3  more concrete at trial, the County may object and seek a ruling from the Court.  Until then, the

4  Court DEFERS ruling on Plaintiffs' first motion *in limine* insofar as it concerns Unit 8A

5  admission criteria and the County's Ferguson blanket policy.

6   **B.  Plaintiffs' Motion *in Limine* No. 2 to Exclude Video Recording of July 27, 2020**
    **Conversation Between Decedent Frederick Regal and Plaintiff Eliana Regal**
7   **(Bates No. PLTFS_000805)**

8       In their second motion *in limine*, Plaintiffs seek to exclude a video produced by Plaintiffs

9  in discovery at Bates No. PLTFS_000805, which "depicts a telephone conversation between

10 plaintiff Eliana Regal, aged 13 at the time, and her father, decedent Frederick Regal."[1]  Dkt. No.

11 147 ("Plfs.' MIL No. 2") at 1.  Plaintiffs argue that the video must be excluded under the Federal

12 Wiretap Act, 18 U.S.C. § 2510 *et seq.*, because neither Eliana nor her father "consented to or even

13 knew about [Eliana's mother] having recorded their conversation."  *Id.* at 2.  Moreover, Plaintiffs

14 argue that Eliana's mother could not have consented on Eliana's behalf, because the Ninth Circuit

15 does not recognize a parental vicarious consent doctrine under the Act.  *Id.*  Plaintiffs also argue

16 that the video should be excluded under Rule 403, because the evidence is cumulative of the

17 County's ability to ask Eliana directly about her last conversation with her father and/or to read

18 deposition transcript testimony to the contents of that conversation.  *Id.* at 3–4.

19      In opposition, the County argues that Plaintiffs waived their objection under the Federal

20 Wiretap Act and that, regardless, the Federal Wiretap Act does not prohibit the use of the

21 evidence.  Dkt. No. 162 ("Opp. to Plfs.' MIL No. 2").  On the first point, Defendant argues that

22 Plaintiffs' written objections in response to the Request for Production seeking this evidence

23 "made no mention of Plaintiffs' objection under the Wiretap Act," meaning that the objection is

24 waived.  *Id.* at 1–2.  On the second point, Defendant argues that Plaintiffs' mother was a "party to

25 the communication" that was being recorded, meaning that it is subject to an exception from the

26 Federal Wiretap Act.  *Id.* at 2 (citing *Caro v. Weintraub*, 618 F.3d 94, 96 (2d Cir. 2010)).  In

27

28 ───────────────
[1] Plaintiff Eliana Regal is no longer a minor.  Because the Parties use Eliana and Frederick Regal's first names in the briefing on this motion *in limine*, the Court follows suit.

4

United States District Court
Northern District of California

1    addition, Defendant argues that vicarious consent is the rule under *California* law, and that

2    Plaintiffs' Ninth Circuit case to the contrary was based on *Nevada* law.  *Id.* at 3.  Finally,

3    Defendant argues that the video is highly relevant to both Regal's history of suicidality and his

4    relationship to his family, and that presentation of the video is not cumulative of testimony from

5    Eliana, because she does not clearly recall the contents of the conversation.  *Id.* at 4–5.

6        "The Federal Wiretap Act . . . prohibits the intentional interception, disclosure, or use of

7    any oral communication without the consent of at least one party to the conversation."

8    *Pyankovska v. Abid*, 65 F.4th 1067, 1074 (9th Cir. 2023), *cert. denied sub nom. Jones v.*

9    *Pyankovska*, 144 S. Ct. 354 (2023).  "Whenever any wire or oral communication has been

10   intercepted, no part of the contents of such communication and no evidence derived therefrom

11   may be received in evidence in any trial, hearing, or other proceeding in or before any court . . . if

12   the disclosure of that information would be in violation of" the Act.  18 U.S.C. § 2515.

13       Both Eliana and her mother submitted declarations in support of the motion attesting that

14   the conversation between Eliana and her father was recorded without either participant's

15   knowledge or consent.  Dkt. No. 147-1, Declaration of Rachel Regal in Support of Plaintiffs'

16   Motion *in Limine* No. 2 to Exclude July 27, 2020 Recorded Conversation Between Decedent

17   Frederick Regal and Plaintiff Eliana Regal ("R.R. Decl.") ¶ 4 ("I did not have permission from

18   either Frederick Regal or Eliana Regal to record their communication.  At the time of the

19   conversation, neither Frederick nor Eliana was aware that I was recording."); Dkt. No. 147-2,

20   Declaration of Eliana Regal in Support of Plaintiffs' Motion *in Limine* No. 2 to Exclude July 27,

21   2020 Recorded Conversation Between Decedent Frederick Regal and Plaintiff Eliana Regal ("E.R.

22   Decl.") ¶ 5 ("My mother, Rachel Regal, never asked me for permission to record my conversation

23   with my father, and I was never aware that she had recorded it until after my father's death.").

24   Thus, the Court concludes that the recording must be excluded unless any exception applies.  No

25   exception does.

26       First, the Ninth Circuit has expressly held that "[t]he vicarious-consent doctrine is not the

27   law of . . . this Circuit."  *Pyankovska*, 65 F.4th at 1075.  As such, the recording cannot be admitted

28   on the premise that Rachel Regal—who "ha[d] physical custody of" Eliana at the time—could

1    "consent to the recording" of the conversation on her daughter's behalf.  *See id.*  To the extent that

2    the County attempts to suggest that the *Pyankovska* decision was based upon Nevada law and that

3    the outcome would differ for a recording made in California, the Court disagrees.  The Court reads

4    the opinion to say that *neither* Nevada law *nor* Ninth Circuit authority on the Federal Wiretap Act

5    provided a basis for admitting the challenged recording in *Pyankovska.*  The opinion does not

6    suggest that the applicability of a vicarious consent exception to the Federal Wiretap Act would

7    vary based on the underlying state's own wiretap law.

8         Second, the Court finds that this is not a case in which the person making the challenged

9    recording "[was] a party to the communication."  18 U.S.C. § 2511(2)(d); *see Planned Parenthood*

10   *Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125, 1135 (9th Cir. 2022) (noting that "a person may

11   record a conversation in which he or she is a party unless the 'communication is intercepted for

12   the purpose of committing any criminal or tortious act'").  The County cites *Caro v. Weintraub*,

13   618 F.3d 94 (2d Cir. 2010), in support of its position that Rachel Regal gave consent to the

14   recording as a "party" to Eliana and her father's conversation.  Specifically, the County argues that

15   Rachel Regal spoke with Frederick both before and after the recording took place, and thus that it

16   was "all one conversation to which Frederick, Rachel, and Eliana were [all] parties."  Opp. to

17   Plfs.' MIL No. 2 at 3.  If that is the case, the County asserts that it does not matter that Eliana was

18   unaware of the recording.  *See id.*

19        It is true that the relevant "party" in the *Caro* case recorded the conversation without the

20   knowledge of other parties.  *Caro*, 618 F.3d at 96.  But he also "spoke up a few times"—a detail

21   that the Second Circuit emphasized in its finding that he "[took] part in the conversation" and thus

22   was a "party."  *Id.* at 97–98.  Here, in contrast, deposition testimony from Rachel Regal reveals

23   that Eliana overheard her mother's conversation with her father and then "grabbed the phone

24   . . . and ran off."  Dkt. No. 162-2 ("R.R. Dep. Tr.") at 127:1–5.  There is no assertion that Rachel

25   Regal spoke up or otherwise took part in the conversation between Frederick Regal and their

26   daughter once Eliana took the phone to her room.  Instead, it appears that—unbeknownst to

27   Eliana—Rachel followed Eliana to the doorway of her bedroom and surreptitiously recorded the

28   conversation between Eliana and Frederick without participating in any way.  This fact clearly

6

distinguishes the present situation from that in *Caro*, and the Court finds that Eliana's

conversation with her father was a *separate* conversation to which Rachel Regal was *not* a party.

Thus, the party-consent exception does not apply in this case and the recording must be excluded.

Accordingly, the Court GRANTS Plaintiffs' second motion *in limine.*

### C.  Plaintiffs' Motion *in Limine* No. 3 to Exclude Defense Life Care Planning Expert Witness Cloie Johnson

In their third motion *in limine*, Plaintiffs move to exclude defense life care planning expert

Cloie Johnson under Federal Rules of Evidence 401 and 403.  Dkt. No. 148 ("Plfs.' MIL No. 3")

at 1.  Plaintiffs argue that Ms. Johnson's "testimony pertains only to economic damages," but

Plaintiffs seek only noneconomic damages at trial.  *Id.*  Thus, Plaintiffs argue that Ms. Johnson's

testimony is "irrelevant because the amount of money future psychotherapy would cost . . . does

not bear on whether or even how much Plaintiffs have suffered emotionally from the loss of their

father."  *Id.* at 2.  In addition, Plaintiffs argue that Ms. Johnson's testimony should be excluded

under Rule 403 because it might confuse the jury by suggesting "that all of Plaintiffs' non-

economic damages can be addressed with a small sum of economic damages for mental health

therapy."  *Id.* at 3.  This might permit Defendant to "artificially deflate" any noneconomic

damages award "by using economic damages as a psychological anchor to weigh down the value

of the damages Plaintiffs are actually claiming."  *Id.* at 4.

In opposition, Defendant argues that Ms. Johnson's "testimony is relevant because her

opinions regarding the cost of Plaintiffs' future mental health care [] will provide the jury with a

helpful, reliable data point in determining the extent of Plaintiffs' noneconomic damages."  Dkt.

No. 163 ("Opp. to Plfs.' MIL No. 3") at 1.  The County accepts that it is difficult to calculate

emotional damages, and that the value of psychological treatment for Plaintiffs is not equivalent to

the value of their noneconomic damages.  *Id.* at 2.  However, Defendant argues that the award of

noneconomic damages must be based on something more exacting than speculation, and that Ms.

Johnson's life care planning testimony will provide a relevant "data point" that the jury can

consider in valuing Plaintiffs' damages.  *Id.* at 2–3.  Moreover, Defendant argues that Ms.

Johnson's testimony is relevant to Plaintiffs' mitigation of damages, and that it is at least as

United States District Court
Northern District of California

7

1    relevant as the testimony that Plaintiffs seek to introduce from their neurologist expert, Dr.

2    Swanson. *Id.* at 3–4. Finally, Defendant argues that Ms. Johnson's testimony should not be

3    excluded under Rule 403, because the County will not suggest that her calculations "cover the

4    totality" of Plaintiffs' damages or that Plaintiffs can only recover for specifically calculable

5    economic damages. *Id.* at 4.

6          Under Federal Rule of Evidence 401, "[e]vidence is relevant if: (a) it has any tendency to

7    make a fact more or less probable than it would be without the evidence; and (b) the fact is of

8    consequence in determining the action." Fed. R. Evid. 401. Under Federal Rule of Evidence 403,

9    "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a

10   danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury,

11   undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

12         The Court concludes that defense expert Ms. Johnson's testimony is not relevant—and

13   even if it was marginally relevant, that relevance would be substantially outweighed by the risk of

14   confusing the issues or misleading the jury. As the defense acknowledges, "Plaintiffs in this

15   action have made clear that they 'do not seek any economic or special damages.'" Opp. to Plfs.'

16   MIL No. 3 at 1. And Ms. Johnson, understandably, "will not opine on the amount or purport to

17   quantify Plaintiffs' noneconomic damages," *id.* at 2, since such damages "are oftentimes not

18   readily amenable to computation." *See Creswell v. HCAL Corp.*, No. 04-cv-388, 2007 WL

19   628036, at *2 (S.D. Cal. Feb. 12, 2007). As a result, there is no throughline between (1) Ms.

20   Johnson's testimony about the cost of mental health treatment and (2) the value of Plaintiffs' Loss

21   of Familial Association claim, because there is no suggestion that such a cost is at all proportional

22   to or otherwise indicative of the value of any noneconomic damages suffered. Similarly, the

23   County cites no testimony or caselaw in support of the idea that the noneconomic damages sought

24   may be mitigated or reduced through therapy. Further, the County has no evidence as to the effect

25   of the proposed mental health counseling on reducing Plaintiffs' damages.

26         The County is correct that the jury should not assign the value of any noneconomic

27   damages awarded *randomly*, but the proper considerations are those related to "the pecuniary

28   value of the decedent's society and companionship," including factors like "the closeness of the

8

family unit, the depth of their love and affection, and the character of the deceased as kind, attentive, and loving," *K.J.P. v. Cnty. of San Diego*, 621 F. Supp. 3d 1097, 1155 (S.D. Cal. 2022)—*not* the dollar amount of mental health treatment.  For this reason, the Court concludes that even if Ms. Johnson's testimony *was* very marginally relevant as a "data point," it should be excluded under Rule 403.  Presenting the specific figures that Ms. Johnson prepared is very likely to confuse or mislead the jurors into believing that they are being asked to compensate Plaintiffs for the costs incurred in seeking mental health treatment, or—as Plaintiffs fear—that Plaintiffs "can only recover for economic damages that they can prove with specific figures."  Plfs.' MIL No. 3 at 3.  As discussed above, neither is true.  Plaintiffs' third motion *in limine* is GRANTED.

### D.  Plaintiffs' Motion *in Limine* No. 4 to Exclude Detailed Evidence Leading to Decedent's 2016 and 2020 Arrests and Detentions

In their fourth motion *in limine*, Plaintiffs ask the Court to exclude detailed evidence of Regal's 2016 and 2020 arrests and jail detentions.  *See* Dkt. No. 149 ("Plfs.' MIL No. 4") at 1. Plaintiffs anticipate that the County plans to introduce testimony, video, and documentary evidence pertaining to Regal's arrests, and argue that such evidence should be excluded because it is irrelevant and unduly prejudicial.  *Id.* at 2–4; *see* Fed. R. Evid. 401, 403.

First, Plaintiffs argue that details of the 2016 arrest should be excluded because no County employee considered them in assessing or addressing Regal's suicide risk.  *Id.* at 3.  Since these details were not known to the County employees who made decisions regarding Regal's suicide risk and suicide prevention interventions, Plaintiffs assert that they are irrelevant to the County's liability, which is based on the reasonableness of the preventative measures Regal received.  *Id.* Regarding damages, Plaintiffs acknowledge that the details of the 2016 arrest may be relevant in assessing the impact of the incident on Plaintiffs' relationship with Regal, but Plaintiffs argue that any evidence admitted should be limited to what is actually known by the Plaintiffs.  *Id.*  They argue that other sources of evidence would not be relevant and would waste time, confuse the issues, or persuade the jurors to dehumanize Regal.  *Id.* at 3–4.  As for the 2020 arrest, Plaintiffs argue that the specific details of that incident are irrelevant and unduly prejudicial because no County employee considered them in assessing Regal's suicide risk and, further, the details of this

1    later arrest were unknown to the Plaintiffs at the time their relationship with Regal ended by his

2    suicide.  *Id.* at 4.

3        In response, the County argues that the details of the arrests are relevant to both liability

4    and damages.  *See* Dkt. No. 164 ("Opp. to Plfs.' MIL No. 4") at 1.  The County states that the

5    2016 arrest is relevant to the County's liability because it was considered during the Classification

6    process to determine Regal's housing arrangements, a central issue to Plaintiffs' liability case.  *Id.*

7    at 1–2.  Likewise, the County argues that the details of the 2020 arrest are relevant to liability,

8    because (1) Regal's mental-health condition and presentation depicted in video footage are

9    relevant to the Plaintiffs' claims regarding the County's treatment of Regal, (2) arresting Officer

10   Ortega's interview with Regal in the footage informed his determination that Regal did not meet

11   the criteria for an involuntary hold, and (3) Regal is calm and cooperative in the footage,

12   discrediting Plaintiffs' claims that more drastic measures were necessary.  *Id.* at 2.  Moreover, the

13   County states that both arrests are directly relevant to Plaintiffs' damages for loss of Regal's care,

14   comfort, and society, because drug usage, involvement with the criminal justice system, and

15   character are all relevant considerations.  *Id.* at 3.  Finally, the County argues that evidence of the

16   arrests should not be excluded under Rule 403, as the evidence has high probative value and any

17   prejudicial effect is not unfair.  *Id.* at 5.

18       As a preliminary matter, the Parties agree that the impact of witnessing the events leading

19   to the 2016 arrest is relevant to Plaintiffs' claim to damages for loss of Regal's care, comfort, and

20   society.  The Court finds, however, that such evidence is not limited to what was actually known

21   by Plaintiffs.  In awarding noneconomic damages for Loss of Familial Association, juries are to

22   consider the warmth of feeling between family members, the closeness of the family unit, the

23   depth of their love and affection, the character of the deceased as kind, attentive, and loving.

24   *K.J.P.*, 621 F. Supp. 3d at 1155; *see also Krouse v. Graham*, 19 Cal. 3d 59, 68 (1977).  Juries may

25   also consider "the life expectancy of the deceased," considering "all relevant factors including the

26   deceased's health, lifestyle and occupation."  *Allen v. Toledo*, 109 Cal. App. 3d 415, 424 (1980).

27   The Court concludes that the circumstances surrounding both the 2016 and 2020 arrests provide

28   relevant evidence of Regal's drug use and involvement in the criminal justice system, which bear

United States District Court
Northern District of California

on his ability to maintain close consistent relationships with his children, as well as on his life expectancy. Thus, the Court finds that the details of both arrests are relevant to show the reality of Plaintiffs' relationship with Regal for purposes of determining noneconomic damages.

That said, the Court finds that such evidence should not be considered for liability. During arguments at the Final Pretrial Conference, Plaintiffs distinguished between Regal's security risk classification and suicide risk classification. Details of Regal's 2016 arrest were considered only for Regal's *security* risk classification, which Plaintiffs do not challenge. Because those details were not considered in determining which suicide prevention measures to implement, the Court finds that details of this arrest are not relevant to the County's liability. Details of the 2020 arrest are somewhat differently situated, since Regal's behavior at the time of his arrest did inform his suicide risk assessment—but this relevance to liability is limited by how little knowledge the County employees who conducted Regal's formal suicide risk assessments had of those details. Thus, the Court finds that details of the 2020 arrest should be excluded under Rule 403 as regards the County's liability.

For the foregoing reasons, the Court will admit this evidence for damages purposes only. The Court acknowledges that there is some risk of prejudice in discussing instances of Regal's past interactions with law enforcement, including details about drug usage or domestic violence, but that risk does not *substantially* outweigh the very high probative value of the evidence to the damages issues. In addition, courts may consider the probable effectiveness of a limiting instruction in decreasing the risk of prejudice. *See* Fed. R. Evid. 403, advisory committee notes. In this case, the Court invites the Parties to prepare a limiting instruction stating that detailed evidence of Regal's 2016 and 2020 arrests is only to be considered in determining noneconomic damages. The Parties shall request that the limiting instruction be read at the appropriate time(s) at trial.

In sum, Plaintiffs' motion to exclude detailed evidence of Regal's 2016 and 2020 arrests is GRANTED insofar as the evidence is sought to be admitted on liability issues, but DENIED insofar as the evidence is sought to be admitted on damages issues.

### E. Plaintiffs' Motion *in Limine* No. 5 to Exclude Evidence of Decedent's Drug Test Results the County Received After the Hanging

In Plaintiffs' final motion *in limine*, they seek to exclude evidence of drug test results from Regal that were not received by the County until after his death. Dkt. No. 150 ("Plfs.' MIL No. 5") at 1. Plaintiffs argue that the County "seeks to admit into documentary evidence the drug test results it only received after Regal's hanging and testimony from Philip Sobolesky, a clinical biochemist," but that the County should not be permitted to do so because those test results are "completely irrelevant" to damages and the issues before the jury. *Id.* at 1–2. Although it is not disputed that Mr. Regal died due to hanging, Plaintiffs are concerned that the drug test information might confuse or mislead the jury regarding the cause of death. *Id.* at 2. In addition, Plaintiffs argue that this evidence might "unduly prejudice the jury against awarding noneconomic damages for Regal or his children." *Id.*

In opposition, the County argues that "Regal's history of drug use, as well as his drug use on and just before July 28, 2020, is 'of consequence to determining the action.'" Dkt. No. 165 ("Opp. to Plfs.' MIL No. 5") at 1. According to the County, this evidence bears upon Regal's state of mind at the time of his arrest, which in turn bears upon the appropriateness of the County's response to the risk of suicide he presented. *Id.* at 1–2. Defendant argues that it is also relevant to Plaintiffs' family loss claim, because closeness, warmth, and life expectancy are all considerations for the valuation of such emotional damages. *Id.* at 2–3. Finally, Defendant argues that the drug test evidence should not be excluded under Rule 403, because the County will not suggest to the jury that Regal's cause of death was drug related and because "[n]ot everything that hurts is unfairly prejudicial." *Id.* at 4 (citing *U.S. v. Akpa*, 120 F. App'x 717, 720 (9th Cir. 2005)).

As with the preceding motion *in limine*, the Court finds that the challenged evidence is not relevant to liability. Since the specific drug test results were not known to the County's employees until after Regal had died, this information could not have informed their assessment as to which suicide prevention measures should be adopted to abate Regal's risk of suicide. For clarity, however, the Court notes that this determination does *not* serve to exclude all evidence of "Regal's history of drug use" or his "drug use on and just before July 28, 2020." Opp. to Plfs.' MIL No. 5 at 1. The County may submit evidence of what was known to or observed by its

United States District Court
Northern District of California

1    employees at the time of Regal's arrest and intake, including his behavior and other evidence

2    bearing upon those employees' conclusions that he might be under the influence of drugs.

3        However, the Court finds that the drug test results *are* relevant to Plaintiffs' noneconomic

4    damages.  In that damages assessment, the jury can consider factors like "the closeness of the

5    family unit," *K.J.P.*, 621 F. Supp. 3d at 1155, and the "life expectancy of the deceased," *Allen*, 109

6    Cal. App. 3d at 424.  These considerations are not limited by the information actually known to

7    the plaintiff claiming the damage, so the jury may properly consider evidence of Regal's drug use

8    even though his children may not have known the specific drugs or quantities used by Regal at the

9    time of his death.  Moreover, the Court finds that the relevance of this evidence to Plaintiffs'

10    damages is not "substantially outweighed" by the risk of prejudice.  Fed. R. Evid. 403.  "[A]ll

11    unfavorable evidence" about a party presents a risk of at least "some prejudice," *Akpa*, 120 F.

12    App'x at 720, so the critical question is whether the challenged evidence has "an undue tendency

13    to suggest decision on an improper basis."  *United States v. Haischer*, 780 F.3d 1277, 1281 (9th

14    Cir. 2015).  Here it does not.  Therefore, Plaintiffs' fifth motion *in limine is* GRANTED insofar as

15    the evidence is sought to be admitted on liability issues, but DENIED insofar as the evidence is

16    sought to be admitted on damages issues.  As with the preceding motion *in limine*, the Parties may

17    prepare a limiting instruction and request that the Court read it at the appropriate time(s) at trial.

18    **II.    DEFENDANT'S MOTIONS *IN LIMINE***

19        **A.  Defendant's Motion *in Limine* No. 1 to Exclude Certain Testimony of Lisa Boesky,**
20            **Ph.D.**

21        In its first motion *in limine*, the County seeks to exclude testimony from Plaintiffs' expert

22    Lisa Boesky, Ph.D., "regarding (1) causation; (2) the standard of care and, relatedly, the suicide-

23    prevention measures she believes the County should have implemented; and (3) the prevalence of

24    suicide-resistant cells."  Dkt. No. 151 ("Deft.'s MIL No. 1") at 1.  Defendant first argues that Dr.

25    Boesky's causation-related opinions would confuse and mislead the jury because she addresses

26    only "cause-in-fact—which is insufficient for *Monell* purposes" because causation in *Monell*

27    claims also requires a showing of proximate causation.  *Id.* at 2.  Second, the County argues that

28    Dr. Boesky's opinions about the standard of care are "irrelevant" because there is no clearly

established right to a certain level of suicide prevention care, and those opinions are likely to confuse or mislead the jury into believing that her testimony about the standard of care addresses the relevant constitutional standard.  *Id.* at 3–4.  Third, the County argues that Dr. Boesky's testimony about the prevalence of suicide-resistant cells should be excluded because she was unable or unwilling to disclose a basis for her opinion on that topic.  *Id.* at 4–5.

In opposition, Plaintiffs argue that "Dr. Boesky's testimony is relevant to the factual issue of causation" without stating a legal conclusion, and that it is also relevant to "the County's actual and constructive knowledge of suicide risks and prevention standards in jails."  Dkt. No. 169 ("Opp. to Deft.'s MIL No. 1") at 1.  On the first point, Plaintiffs argue that Dr. Boesky need not testify to all of the elements of *Monell* causation in order to provide an opinion that is helpful to the jury.  *Id.* at 1–2.  On the second point, Plaintiffs argue that Dr. Boesky's testimony on standards related to jail suicide prevention will help the jury to understand terminology and common suicide prevention practices.  *Id.* at 2–4.  Finally, Plaintiffs argue that Dr. Boesky's opinions regarding the prevalence of suicide-resistant cells is "based on her experience because there is very limited actual data," and that she is permitted to offer opinions based on facts that she observes through her industry experience.  *Id.* at 4.

First, the Court concludes that Dr. Boesky's testimony regarding causation need not be excluded.  True, her opinions do not seem to address both the causation-in-fact and the proximate causation requirements subsumed in the "moving force" element of the *Monell* test, *see Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013)—but as Plaintiffs point out, it would be improper for Dr. Boesky to "give an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law," anyway.  *See Camenisch v. Umpqua Bank*, 763 F. Supp. 3d 871, 881 (N.D. Cal. 2025) (quoting *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)).  Rather, Dr. Boesky may provide testimony based on her expertise regarding whether the County's conduct was a substantial contributing factor to Regal's suicide.  That her opinion does not cover all of the elements of the claim is a matter that the County may take up in cross examination and closing argument.  It is for the Parties' attorneys to argue whether Plaintiffs have proven that the conduct was "the moving force behind the constitutional violation."  *Gordon v.*

United States District Court
Northern District of California

1    *Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021) (quoting *Dougherty v. City of Covina*, 654 F.3d

2    892, 900 (9th Cir. 2011)). The County's first motion *in limine* is DENIED insofar as it seeks to

3    exclude Dr. Boesky's causation opinions.

4         Whether to permit Dr. Boesky's testimony regarding the standard of care for jail suicide

5    prevention is a closer question. Plaintiffs' *Monell* claim requires more than a showing of "mere

6    lack of due care." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (quoting

7    *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)); *see Cortez v. Skol*, 776 F.3d

8    1046, 1050 (9th Cir. 2015) ("Deliberate indifference is 'something more than mere negligence.'"

9    (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994))). And no Supreme Court decision has

10   established a right to a specific suicide prevention protocol or to "the proper implementation of

11   adequate suicide prevention protocols." *Taylor v. Barkes*, 575 U.S. 822, 826 (2015). Thus,

12   Plaintiffs may *not* use Dr. Boesky's testimony to suggest that the standard of care defines the

13   constitutional parameters of Plaintiffs' claim. However, the Court agrees with Plaintiffs that

14   suicide prevention standards widely known in the industry are relevant to the issue of notice. *See*

15   *Germaine-McIver v. Cnty. of Orange*, No. SACV1601201, 2018 WL 6258896, at *6 (C.D. Cal.

16   Oct. 31, 2018) ("Deliberate indifference may be found '[w]here a § 1983 plaintiff can establish

17   that the facts available to city policymakers put them on actual or constructive notice that the

18   particular omission is substantially certain to result in the violation of the constitutional rights of

19   their citizens.'" (quoting *Castro*, 833 F.3d at 1076)). In addition, Dr. Boesky's expertise could be

20   helpful to the jury's understanding of the various suicide prevention protocols that the County had

21   adopted at the time. Therefore, the County's motion is DENIED to the extent that it seeks to

22   exclude Dr. Boesky's testimony regarding suicide-prevention standards and practices widely used

23   in jails. This denial is without prejudice to the County objecting at trial if the questioning suggests

24   that the jury may find the County liable for failing to meet those standards.

25        Finally, the Court finds that it would be premature to prevent Dr. Boesky from testifying

26   regarding the prevalence of suicide-resistant cells at this time. The Court's "gatekeeping" function

27   under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), "is to ensure the

28   reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152

1   (1999).  In relation to that function, "[a]n expert's specialized knowledge and experience can serve

2   as the requisite 'facts or data' on which they render an opinion."  *Elosu v. Middlefork Ranch Inc.*,

3   26 F.4th 1017, 1024 (9th Cir. 2022).  Here, Plaintiffs assert that Dr. Boesky's opinion "is based on

4   her experience," Opp. to Deft.'s MIL No. 1 at 4, and the County had the opportunity to question

5   Dr. Boesky about the opinion during her deposition, *see* Dkt. No. 151-2 ("Boesky Dep. Tr.") at

6   24:18–25:10, 27:14–28:5, 152:3–158:25.  Based upon that questioning, the foundation for Dr.

7   Boesky's testimony about the prevalence of suicide-resistant cells appears weak, but the Court

8   concludes that the County's motion goes more to the weight or credibility that should be accorded

9   the opinion and therefore declines to exclude it—for now.  If, however, the questioning at trial

10  reveals that Dr. Boesky's opinion is unsupported or speculative, the County may request that the

11  Court strike it.

12          In sum, the County's first motion *in limine* is DENIED.

13      **B.  Defendant's Motion *in Limine* No. 2 to Exclude Certain Evidence Relating to the
         *Chavez* Federal Consent Decree**

15          In its second motion *in limine*, the County seeks to exclude "any evidence [] about the

16  County's level of compliance with the [*Chavez*] consent decree," and "any evidence showing

17  and/or suggesting that Deputy County Counsel Aryn Paige Harris . . . is also lead counsel for the

18  County in the *Chavez* matter.  Dkt. No. 152 ("Deft.'s MIL No. 2") at 1.  The first part of the

19  County's motion refers to the consent decree entered in *Chavez et al. v. County of Santa Clara*,

20  No. 15-cv-05277-RMI (N.D. Cal.), which requires the County to "fully implement all of the

21  remedial measures set forth in the Remedial Plan."  Deft.'s MIL No. 2 at 1.  The Remedial Plan is

22  "designed to meet the minimum level of health care necessary to fulfill [the County's] obligations

23  under the Eighth and Fourteenth Amendments."  *Id.* (quoting Deft.'s MIL No. 2, Ex. 1 ("Consent

24  Decree") ¶ 10, and citing Deft.'s MIL No. 2, Ex. 2 ("Remedial Plan")).  The County

25  acknowledges that the existence of the consent decree is "a relevant background fact," and indeed,

26  states that "[c]ertain facts relevant to the County's defenses also require an understanding that the

27  consent decree existed at the time of Regal's death."  *Id.* at 2.  However, the County argues that its

28  level of compliance with the consent decree is irrelevant, because such decrees "do[] not provide a

United States District Court
Northern District of California

1    right secured by the Constitution or laws of the United States" and often "go beyond" minimum

2    constitutional requirements.  *Id.* at 3 (quoting *Garcia v. Stewart*, No. 06-cv-6735, 2009 WL

3    688887, at *7 (N.D. Cal. Mar. 16, 2009), and *Cagle v. Sutherland*, 334 F.3d 980, 986–87 (11th

4    Cir. 2003)).  Regarding the second part of the County's motion, the County argues that Attorney

5    Harris's name appears on certain exhibit documents related to *Chavez*, and that seeing her name

6    there might confuse the jury.  *Id.* at 4–5.

7         In their opposition brief, Plaintiffs acknowledge that they "are not suing the County under

8    the Consent Decree or for its lack of compliance with the Consent Decree."  Dkt. No. 170 ("Opp.

9    to Deft.'s MIL No. 2") at 1.  However, they argue that the consent decree is relevant evidence in

10   the case because it "put the County on notice of what suicide prevention interventions were

11   necessary."  *Id.* at 2.  In addition, Plaintiffs argue that it would be unfair to permit Defendant to

12   "use the Consent Decree as a shield" while preventing Plaintiffs from using it as evidence of

13   notice.  *Id.* at 2–3.  Plaintiffs do not oppose the redaction of Attorney Harris's name from any

14   *Chavez* documents that are used at trial.  *Id.* at 4.

15        For similar reasons as discussed with regard to the County's first motion *in limine*, the

16   Court concludes that the *Chavez* consent decree is relevant to the issue of notice.  *See Germaine-

17   McIver*, 2018 WL 6258896, at *6 ("Deliberate indifference may be found '[w]here a § 1983

18   plaintiff can establish that the facts available to city policymakers put them on actual or

19   constructive notice that the particular omission is substantially certain to result in the violation of

20   the constitutional rights of their citizens.'" (quoting *Castro*, 833 F.3d at 1076)).  That said, the

21   County is correct that "a remedial court decree does not provide a right secured by the

22   Constitution or laws of the United States."  *Garcia*, 2009 WL 688887, at *7; *Mitchell v. CDCR*,

23   No. 21-cv-01781, 2021 WL 5206135, at *3 (S.D. Cal. Nov. 9, 2021) ("Section 1983 provides a

24   vehicle for plaintiffs to seek redress for injuries to their own constitutional rights, not to enforce

25   prophylactic measures or technical requirements of state law, policy, remedial decree, or

26   settlement agreements." (quoting *Rader v. County of Placer*, No. 19-cv-1265, 2021 WL 3662411,

27   at *5 (E.D. Cal. Aug. 18, 2021)))).  As with Dr. Boesky's testimony regarding suicide prevention

28   standards, then, Plaintiffs may not use evidence related to the *Chavez* consent decree to suggest

United States District Court
Northern District of California

17

United States District Court
Northern District of California

1    that the County's noncompliance provides a basis for finding liability on Plaintiffs' claims.

2    Regarding the exclusion of evidence of Deputy County Counsel Aryn Paige Harris's involvement

3    in the *Chavez* action, the Parties are in agreement that Counsel Harris's name may be redacted

4    from any *Chavez* documents used at trial.  *See* Opp. to Deft.'s MIL No. 2 at 4.

5         Therefore, the Court GRANTS IN PART AND DENIES IN PART the County's second

6    motion *in limine*.  The Court will exclude as irrelevant testimony and other evidence addressing

7    the County's level of compliance or noncompliance with the consent decree, and Counsel Harris's

8    name SHALL be redacted from any *Chavez* documents used at trial.  However, the Court will

9    allow evidence related to the *Chavez* consent decree for purposes of demonstrating notice, and

10   either side is permitted to discuss the conditions and policies in effect at the time that Regal was

11   held in County custody.  To help address the risk of confusing or misleading the jury as to the

12   proper use for this evidence, the Parties may prepare a limiting instruction and request that the

13   Court read it at the appropriate time(s) during trial.

### C.  Defendant's Motion *in Limine* No. 3 to Exclude Testimony of Raymond A. Swanson, M.D.

16        In its third motion *in limine*, the County moves to exclude the testimony of Plaintiffs'

17   expert Raymond A. Swanson, M.D., who is "a neurologist whom Plaintiffs disclosed to opine on

18   the duration of Frederick Regal's pre-death pain and suffering."  Dkt. No. 153 ("Deft.'s MIL No.

19   3") at 2.  Defendant argues that Dr. Swanson is not qualified to opine on Regal's pre-death pain

20   and suffering because he "lacks experience treating patients with the type of injury Regal had

21   when he died," and only conducted literature research on the topic of how long Regal might have

22   suffered after he was retained by Plaintiffs in this case.  *Id.* at 3.  Moreover, Defendant contends

23   that even if Dr. Swanson is *qualified* to testify on this subject, "his testimony would also be

24   excludable because it is not 'based on sufficient facts or data.'"  *Id.* at 4 (quoting *Elosu*, 26 F.4th at

25   1023).

26        In opposition, Plaintiffs argue that Dr. Swanson is a highly qualified expert with regard to

27   "neuronal death and loss of consciousness" and that his testimony will assist the jury.  Dkt. No.

28   171 ("Opp. to Deft.'s MIL No. 3") at 1.  Plaintiffs assert that the "data and literature are sparse"

1    with regard to hanging-related deaths, and that Dr. Swanson has reviewed and considered the

2    information available in relation to his own experiences to come to his conclusions.  *Id.* at 2–3.

3        Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by

4    knowledge, skill, experience, training, or education may testify in the form of an opinion or

5    otherwise if the proponent demonstrates to the court that it is more likely than not that":

6        (a) the expert's scientific, technical, or other specialized knowledge will help the
     trier of fact to understand the evidence or to determine a fact in issue;

7        (b) the testimony is based on sufficient facts or data;

8        (c) the testimony is the product of reliable principles and methods; and
         (d) the expert's opinion reflects a reliable application of the principles and methods

9    to the facts of the case.

10   Fed. R. Evid. 702.  On the preliminary question about whether Dr. Swanson is qualified, *see* Fed.

11   R. Evid. 104(a), the Court concludes that he is.  While patients with hypoxic/ischemic brain injury

12   may have made up a relatively small part of Dr. Swanson's clinical practice, the Court finds that

13   he still has substantial knowledge and experience related to this kind of brain injury.  *See* Dkt. No.

14   153-2 at 22, 24–58.  And, as Plaintiffs argue, Opp. to Deft.'s MIL No. 3 at 3, it is not surprising

15   that the literature on deaths by hanging is more limited than literature in other research areas might

16   be.  This limitation should not impugn Dr. Swanson's neurology expertise and ability to provide

17   helpful expert testimony regarding the mechanics of hypoxic/ischemic brain injuries.  Likewise,

18   the fact that Dr. Swanson conducted research on the subject of loss of consciousness during

19   hanging after he was retained by Plaintiffs' counsel does not—in and of itself—undermine a

20   finding that he is qualified as an expert in this matter.

21       However, the Court concludes that certain of Dr. Swanson's opinions are not based on

22   sufficient facts or data and should be excluded.  Specifically, Plaintiffs seek to admit Dr.

23   Swanson's opinions that individuals experiencing "partial hanging[s]" will take "much longer to

24   lose consciousness," and that Regal might have remained conscious for "up to 10 minutes."  Dkt.

25   No. 153-2 ("Swanson Dep. Tr.") at 32:16–23; *id.* at 37:23–38:13.  But Dr. Swanson admitted at

26   his deposition that the support for his conclusion that Regal could have remained conscious for up

27   to 10 minutes was "an editorial written for . . . a London newspaper," Swanson Dep. Tr. at 43:5–

28   22, that was authored by a journalist who cited as support for the 10-minute period an online

United States District Court
Northern District of California

United States District Court
Northern District of California

1    "suicide user-guide[]" that did not, in turn, provide the source for the statement, Dkt. No. 153-3 at

2    3.  Dr. Swanson also remarked that "[f]or all [he] [knew] [the commentator] made the whole thing

3    up."  Swanson Dep. Tr. at 45:25–46:8.  Further, Dr. Swanson stated that, beyond a range of about

4    13–25 seconds, "[n]obody knows" how long someone would stay conscious during a partial

5    hanging.  Swanson Dep. Tr. at 43:23–44:12.  And the scientific study on which Dr. Swanson

6    relied in forming his opinions does not provide support for the conclusion that individuals

7    experiencing partial hangings take longer to lose consciousness.  *See* Dkt. No. 153-2 at 64 ("It is

8    generally thought in the forensic community that . . . hangings with complete suspension of the

9    body lead[] to death more quickly than hangings in which the body is partially supported (e.g., feet

10   or knees on the floor). . . .  However, this study does not support this assumption.").  Even Dr.

11   Swanson's conclusion that an individual would remain conscious for 13–25 seconds is only

12   tenuously supported by that study, which concluded that the likely range for consciousness was 8–

13   18 seconds.  *See id.* at 62.  But because 13 seconds is within the supported range and 25 seconds

14   departs by only 7 seconds, the Court will permit Dr. Swanson to offer that testimony, and the

15   County is free to probe his opinion on cross-examination.

16        Accordingly, the County's third motion *in limine* is GRANTED IN PART AND DENIED

17   IN PART.  The Court finds that Dr. Swanson is qualified to provide expert testimony regarding

18   hypoxic/ischemic brain injury, but Dr. Swanson may not offer his opinions that (1) Regal might

19   have remained conscious for longer than 25 seconds, or (2) individuals experiencing partial

20   hangings take longer to lose consciousness, since neither of those opinions is supported by

21   sufficient facts or data.

22        **D.  Defendant's Motion *in Limine* No. 4 to Exclude Certain Evidence Relating to
23        Frederick Regal's 15-Minute Checks**

24        In its fourth motion *in limine*, the County moves to exclude "evidence regarding any

25   alleged deficiencies in the County correctional deputies' 15-minute checks of Plaintiffs' father,"

26   such as "untimely or missed checks."  Dkt. No. 154 ("Deft.'s MIL No. 4") at 1.  The County

27   argues that this evidence is irrelevant to Plaintiffs' *Monell* claim, because that claim does not

28   involve an allegation by Plaintiffs that the County had a policy or custom of deficient 15-minute

United States District Court
Northern District of California

1    checks.  *Id.* at 2–3.  In addition, the County asserts that evidence of isolated incidents of deficient

2    checks cannot support *Monell* liability.  *Id.* at 3.  Finally, the County argues that any relevance this

3    evidence might have is substantially outweighed by the risk of unfair prejudice because it might

4    confuse the issues and "poison the jury against the County."  *Id.*

5        In response, Plaintiffs argue that "evidence of the County's untimely and missed checks is

6    highly probative evidence regarding the sole suicide risk reduction measure the County permitted

7    its mental health clinician to give Regal."  Dkt. No. 172 ("Opp. to Deft.'s MIL No. 4") at 1.

8    Plaintiffs assert that they should be permitted to introduce this evidence to challenge the County's

9    argument that its practices were reasonable, and as impeachment evidence.  *Id.* at 2–3.

10        Plaintiffs' theory in this case is that the County had a custom and practice of housing

11    individuals with a known risk of suicide in cells with obvious hanging points and without

12    reasonable measures in place to abate that risk.  Opp. to Deft.'s MIL No. 4 at 2.  Related to that

13    theory, Plaintiffs have specifically challenged whether the County's 15-minute check intervention

14    should have involved "staggered" checks—but they have *not* alleged that there were systemic

15    issues involving County employees' failure to adequately carry out the checks.  *See, e.g.*, Dkt. No.

16    142 ("SAC") ¶¶ 21, 29, 42.  Evidence of individual County employees missing checks or

17    conducting them in an untimely matter is thus not relevant to Plaintiffs' theory.  And even if it was

18    marginally relevant, the risk that the evidence would confuse or mislead the jury into believing

19    that the County's liability should be based on those individual instances of missed or untimely

20    checks substantially outweighs the relevance.  A "custom and practice" theory must be based on

21    "persistent and widespread" conduct effectively constituting a "well settled [municipal] policy;" it

22    "may not be predicated on isolated or sporadic incidents" such as one officer conducting the

23    welfare check intervention inadequately.  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

24    Accordingly, the Court GRANTS the County's fourth motion *in limine*.  This Order does not

25    prevent Plaintiffs from introducing the evidence for impeachment purposes.

26
27        **E.  Defendant's Motion *in Limine* No. 5 to Confine Scope of Plaintiffs' Cross-
           Examination of Edward Kaftarian, M.D.**

28        In its final motion *in limine*, the County moves "to confine the scope of Plaintiffs' cross-

1   examination of the County's expert, Dr. Edward Kaftarian, M.D." Dkt. No. 155 ("Deft.'s MIL

2   No. 5") at 1. The County argues that Dr. Kaftarian opined in his expert report only on the "care

3   and treatment provide[d] by the County of Santa Clara's suicide prevention program" and

4   "Plaintiffs' allegations of the inadequacy of" that program. *Id.* Because "Plaintiffs' counsel went

5   far beyond the scope" of those opinions during Dr. Kaftarian's deposition, the County aims to

6   tether the scope of his opinions at trial to that laid out in his expert report, in order to prevent

7   Plaintiffs from "unfairly weaponiz[ing]" the County's expert against it. *Id.* at 2–3.

8           In opposition, Plaintiffs argue that they should be permitted to question Dr. Kaftarian about

9   his opinions in light of facts related to Regal's drug use and risk of suicide, as well as "about the

10  increase in suicide risk specifically for jail inmates . . . because jail inmates are more likely to be

11  detoxing from drugs obtained outside of jail." Dkt. No. 173 ("Opp. to Deft.'s MIL No. 5") at 1–2.

12  Plaintiffs argue that such questioning is "highly probative of risk of suicide in jails" and is an

13  appropriate line of questioning based on Dr. Kaftarian's expertise. *Id.* at 2.

14          In general, "[c]ross-examination should not go beyond the subject matter of the direct

15  examination and matters affecting the witness's credibility." Fed. R. Evid. 611(b). When it

16  comes to expert testimony, the scope of a direct examination is defined by that of the expert's

17  pretrial disclosures and reports. *See Am. Airlines Flow-Thru Pilots Coal. v. Allied Pilots Ass'n*,

18  No. 15-cv-03125, 2021 WL 2930095, at *5 (N.D. Cal. May 6, 2021), *aff'd*, No. 21-16131, 2022

19  WL 4481533 (9th Cir. Sept. 27, 2022) (citing *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259

20  F.3d 1101, 1106 (9th Cir. 2001)). These guideposts limit the extent to which a party can

21  commandeer another party's expert to procure favorable opinion testimony on a topic outside of

22  those addressed by the party offering the expert.

23          In this case, Dr. Kaftarian was disclosed to offer expert opinions related to the care and

24  treatment provided to individuals in custody through the County's suicide prevention program.

25  *See* Dkt. No. 155-2 at 1 ("At your request, I am offering a professional evaluation of the care and

26  treatment provided by County of Santa Clara's suicide prevention program . . . and Plaintiffs'

27  allegations of the inadequacy of the County's suicide prevention program."). Plaintiffs are entitled

28  to probe the opinions that he asserts on these topics. However, if questioning by Plaintiffs is

United States District Court
Northern District of California

22

1  untethered from Dr. Kaftarian's report and opinions—for example, if Plaintiffs seek testimony on

2  a standard of care or on how Dr. Kaftarian treats, or trains clinicians to treat, a detoxing patient—

3  then Plaintiffs have gone too far.  Because it is difficult to draw the line separating proper from

4  improper cross-examination in a vacuum, the Court must DEFER ruling on the County's fifth

5  motion *in limine* until trial.  If the County wishes to challenge a particular line of Plaintiffs'

6  questioning, the County may object and/or request a sidebar to discuss whether the questioning

7  falls properly within the scope of Dr. Kaftarian's report and opinions given in this case.

8  **III.    ORDER**

9         For the foregoing reasons, IT IS HEREBY ORDERED that:

10             1.  Plaintiffs' first motion *in limine* is GRANTED IN PART AND DEFERRED IN

11                 PART.

12             2.  Plaintiffs' second motion *in limine* is GRANTED.

13             3.  Plaintiffs' third motion *in limine* is GRANTED.

14             4.  Plaintiffs' fourth motion *in limine* is GRANTED IN PART AND DENIED IN

15                 PART.

16             5.  Plaintiffs' fifth motion *in limine* is GRANTED IN PART AND DENIED IN

17                 PART.

18             6.  Defendant's first motion *in limine* is DENIED.

19             7.  Defendant's second motion *in limine* is GRANTED IN PART AND DENIED

20                 IN PART.

21             8.  Defendant's third motion *in limine* is GRANTED IN PART AND DENIED IN

22                 PART.

23             9.  Defendant's fourth motion *in limine* is GRANTED.

24             10. Defendant's fifth motion *in limine* is DEFERRED.

25         **IT IS SO ORDERED.**

26  Dated:  May 31, 2025

27  _____

28  BETH LABSON FREEMAN
    United States District Judge

*(left margin, rotated)* United States District Court
Northern District of California

23